United States Court of Appeals
Fifth Circuit

**F I L E D**

September 8, 2004

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 13, 2004
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-10455
c/w No. 03-10505
c/w No. 03-10722

_____

RODERICK KEITH JOHNSON

Plaintiff - Appellee

v.

GARY JOHNSON; ET AL

Defendants

GARY JOHNSON; ROBERT R TREON, Senior Warden Allred Unit;
RICHARD E WATHEN; JAMES D MOONEYHAM, Assistant Warden Allred
Unit; TOMMY NORWOOD, Major; KENNETH BRIGHT, Major; TRACY
KUYAVA, Administrative Technician Unit Classification
Committee; TINA VITOLO, Administrative Technician Unit
Classification Committee; VIKKI D WRIGHT, Director,
Classification; JOSEPH BOYLE, Captain; JIMMY BOWMAN, Major;
KENNETH WILLINGHAM, Sergeant; OSCAR PAUL, Lieutenant;
ONESSIMO RANJEL, Lieutenant; DAVID TAYLOR, Lieutenant

Defendants - Appellants

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Before KING, Chief Judge, and BARKSDALE and PICKERING, Circuit
Judges.

KING, Chief Judge:

This is a § 1983 suit brought by a former Texas prisoner

against fifteen prison officials.  According to the plaintiff's

version of events, which is disputed by the defendants, he suffered through a horrific eighteen-month period of incarceration during which the defendant prison officials failed to protect him from prison gangs who repeatedly raped him and bought and sold him as a sexual slave. His complaint asserted violations of the Eighth Amendment and the Equal Protection Clause. The district court denied the defendants' motions for judgment on the pleadings and for summary judgment, and they now bring these interlocutory appeals. The defendants argue that the plaintiff largely failed to exhaust his administrative remedies and that any exhausted claims are barred by qualified immunity. We conclude that the majority, but not all, of the plaintiff's claims must be dismissed on grounds of failure to exhaust or qualified immunity. We therefore affirm in part, reverse in part, and remand.

## I. GENERAL BACKGROUND

Roderick Johnson entered the Texas prison system in January 2000 after the revocation of a sentence of probation that he had received for a nonviolent burglary. He was transferred to the system's Allred Unit on September 6, 2000. Upon arriving at Allred, Johnson met with a three-person Unit Classification Committee (UCC) for a determination of his initial housing status. Prison officials knew that Johnson was homosexual and possessed an effeminate manner. Johnson told the UCC that he had

been housed in "safekeeping" before his transfer.[1]  Safekeeping is a housing status that separates vulnerable individuals from more aggressive offenders.  According to Texas Department of Criminal Justice (TDCJ) regulations, safekeeping is indicated when an inmate is at risk of victimization, has enemies in the population, has a history of homosexuality, or possesses other characteristics that mark the offender as vulnerable to predation.  But according to Johnson, one of the members of the UCC told him that "[w]e don't protect punks on this farm"--"punk" being prison slang for a homosexual man.  Johnson was put in the general population.  He was raped by other inmates almost immediately.

Johnson's complaint and affidavit describe a horrific series of events that allegedly occurred over the next eighteen months at Allred.  In October 2000, not long after his arrival in the general population, a prison gang member named Hernandez asserted "ownership" over Johnson, forcing Johnson to become his sexual servant.  Johnson informed Assistant Warden Mooneyham and Sergeant Willingham of the rapes and requested medical attention,

---

[1]     The parties' briefs take apparently conflicting positions on whether Johnson was housed in safekeeping before his transfer.  Johnson's brief says that "he had been housed in safekeeping just before he was transferred to Allred Unit."  But the defendants say that "Johnson was not classified 'safekeeping' prior to the his arrival at the Allred Unit."  It appears that both sides are technically correct: Johnson was housed in transient safekeeping shortly before his transfer, but he was not officially classified to that status.

but they told him that care was available only for emergencies and that he should file a written request for medical attention. By November, Hernandez began to rent Johnson out to perform coerced sexual favors for other inmates. Johnson believed that he would be severely beaten or killed if he refused. Hernandez beat Johnson on November 30, and medical personnel documented bruising and swelling on Johnson's face. At several times over the following months, Johnson was moved to different buildings at Allred and was raped and owned by different prison gangs.

Johnson sought help from guards, filed numerous "life-endangerment" forms, and wrote letters to prison administrators. Prison officers who investigated Johnson's complaints generally determined that they could not be corroborated; the officers usually did not interview any of the inmates mentioned in Johnson's complaints, purportedly out of a concern to protect the "integrity of the investigation" or to protect Johnson. Johnson's life-endangerment forms triggered a number of appearances before UCCs composed of various prison officials and employees. Johnson asked the UCCs to place him in safekeeping status, place him in protective custody (which entails a significant loss of privileges), or transfer him to a different prison on multiple occasions: December 13, 2000; February 14, 2001; February 21, 2001; March 16, 2001; September 5, 2001; December 13, 2001; and January 17, 2002. Each time the committee refused Johnson's requests, ostensibly because there was no

4

concrete evidence of victimization.  According to Johnson, the members of the committees repeatedly told him that he either had to fight off his attackers or submit to being used for sex.  The comments allegedly made by the UCC members, which they dispute, include statements such as: "You need to get down there and fight or get you a man," "There's no reason why Black punks can't fight and survive in general population if they don't want to f***," and remarks to the effect that, since Johnson was homosexual, he probably liked the sexual assaults he was experiencing.

In addition to writing letters to administrators and filing life-endangerment notices, Johnson also used the TDCJ's formal two-step administrative grievance process on several occasions.  The grievances described his victimization and his repeated unsuccessful requests for protection or a transfer to safekeeping.  The grievances were denied, generally on the basis that unit officials or UCC committees had already conducted proper investigations and had found no substantiating evidence.[2]

Johnson eventually contacted the American Civil Liberties Union.  Shortly thereafter, Johnson went before the UCC again, on April 1, 2002, and was approved for a transfer to TDCJ's Michael Unit.  During his December 2002 deposition, Johnson testified

---

[2]    Additional details regarding Johnson's grievances are provided later, in conjunction with our analysis of the exhaustion issue.

5

that he had not suffered attacks at the Michael Unit, where he was housed in safekeeping.

Johnson filed suit in the district court in April 2002 against over a dozen TDCJ officials and employees. The defendants comprise supervisory officials such as TDCJ Executive Director Gary Johnson,[3] Senior Warden Treon, Assistant Warden Wathen, Assistant Warden Mooneyham, and Director of Classification Wright; guards who failed to protect Johnson on discrete occasions (namely, Lieutenant Paul[4] and Sergeant Willingham); and many of the members of the various UCCs that had denied Johnson protection (namely, Major Norwood, Major Bright, UCC Administrative Technician Kuyava, UCC Administrative Technician Vitolo, Captain Boyle, Major Bowman, Lieutenant Ranjel, and Lieutenant Taylor).[5] The lengthy complaint asserted three causes of action: (1) failure to protect Johnson from harm, in violation of the Eighth Amendment, (2) a race-based Equal

---

[3] This defendant is referred to in this opinion as "Executive Director Johnson." The name "Johnson" refers to the plaintiff, Roderick Johnson.

[4] The incident involving Paul occurred in March 2002. According to Johnson, a group of inmates molested him and a mentally ill inmate in the showers. Afterward, Johnson told Paul, who offered no assistance and instead made menacing comments to Johnson.

[5] There is some overlap among these general categories of defendants. For instance, Wathen sometimes sat on the UCC; Mooneyham sat once on the UCC and (with Willingham) was involved in the October 2000 incident described earlier, in addition to carrying out his supervisory responsibilities.

Protection claim charging that officials denied him protection because he is black, and (3) a sexual-orientation-based Equal Protection claim predicated on the allegation that the defendants denied Johnson protection out of anti-homosexual animus. The suit sought injunctive relief and damages. The defendants answered Johnson's complaint with a blanket denial of almost all of its allegations.

In July 2002, Executive Director Johnson, Treon, and Wright moved for judgment on the pleadings on Johnson's Equal Protection claims (but not the Eighth Amendment claim). The plaintiff did not oppose this motion, and the district court later granted it.

In November 2002, all of the defendants filed a motion to dismiss the case for failure to exhaust administrative remedies, and, at the same time, all of the defendants who were still facing Equal Protection claims (i.e., all defendants but Executive Director Johnson, Treon, and Wright) filed a motion for judgment on the pleadings with regard to the Equal Protection claims.[6] The motion for judgment on the pleadings asserted, inter alia, an entitlement to qualified immunity on the ground that Johnson had not alleged violations of rights that were clearly established.

---

[6] At the same time, two of the defendants (Executive Director Johnson and Paul) also sought judgment on the pleadings with regard to Johnson's Eighth Amendment claim. The other defendants, however, did not challenge the Eighth Amendment theory at the pleadings stage.

While those motions were still pending, the defendants also filed, in January 2003, a motion for summary judgment on the Eighth Amendment claims, again asserting qualified immunity among other grounds. The motion also reasserted the defendants' arguments concerning Johnson's Equal Protection claims.

On April 9, 2003, the district court denied the defendants' January 2003 motion for summary judgment in an order stating that fact issues remained regarding whether the defendants acted with deliberate indifference to a substantial risk to Johnson's safety; the court further held that the factual disputes precluded a ruling on qualified immunity on the current record. The court's order also rejected the defendants' exhaustion argument, which they had re-urged in their motion for summary judgment.

The defendants then requested a ruling on the still-pending November 2002 motion for judgment on the pleadings, which largely concerned the Equal Protection claims. On April 17, 2003, the court denied the motion for judgment on the pleadings, concluding that Johnson's pleadings adequately stated a claim. The order also denied as moot the motion to dismiss for failure to exhaust, as the court's previous order had rejected that argument. Finally, the order denied as moot the request for qualified immunity, the court having already determined that material fact issues required trial.

The defendants filed a notice of appeal from the April 9 order denying summary judgment, and this became appeal No. 03-10455. Later, they filed a notice of appeal from the April 17 order denying the motion for judgment on the pleadings--docketed as appeal No. 03-10505. Both interlocutory appeals are predicated on the rule that denials of qualified immunity based on issues of law are immediately appealable under the collateral order doctrine. See Mitchell v. Forsyth, 472 U.S. 511, 524-30 (1985). The district court later certified, and this court granted leave to pursue, an interlocutory appeal of the district court's ruling that Johnson had exhausted his administrative remedies--appeal No. 03-10722. See 28 U.S.C. § 1292(b).

Johnson has filed motions to dismiss Nos. 03-10505 and 03-10455 for want of appellate jurisdiction.

On December 19, 2003, Johnson was released from prison into mandatory supervision at a halfway house. The defendants have argued, and the plaintiff conceded at oral argument, that Johnson's claims for injunctive relief and his claims against the defendants in their official capacities have been rendered moot, leaving only his claims against the defendants in their individual capacities for damages.

## II. EXHAUSTION

Under the Prison Litigation Reform Act (PLRA), prisoners are required to exhaust administrative remedies before filing suit:

9

"No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a) (2000).  The defendants argue that Johnson's grievances were insufficiently detailed, untimely, or both, thus failing to exhaust his administrative remedies.  We review de novo the district court's denial of the motion to dismiss for failure to exhaust.  Richardson v. Spurlock, 260 F.3d 495, 499 (5th Cir. 2001).

The Texas prison system has developed a two-step formal grievance process.  The Step 1 grievance, which must be filed within fifteen days of the complained-of incident, is handled within the prisoner's facility.  After an adverse decision at Step 1, the prisoner has ten days to file a Step 2 grievance, which is handled at the state level.  This court has previously held that a prisoner must pursue a grievance through both steps for it to be considered exhausted.  See Wright v. Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001).

The record in this case includes portions of the guidelines that TDCJ provides prisoners regarding how to file grievances. Among other things, the rules direct inmates to write "briefly and clearly" but also to "be very specific about your grievance or your problem."  They state that a grievance should contain facts, not legal words or conclusions.  They further direct the

prisoner to "[t]ell us what action you want us to take to resolve your grievance or problem," but they specifically state that a prisoner should "not ask us to take disciplinary action against employees."  The guidelines state that an inmate should not "submit repetitive grievances on the same issue."  Finally, they warn that an inmate is subject to sanctions for abusing the grievance process, such as by making "excessive, frivolous and vexatious use of the procedure."

In addition to writing many administrative life-endangerment notices and letters, Johnson twice filed formal grievances on TDCJ-provided standard forms and pursued them through the two-step process just described.  In particular, he filed Step 1 grievances on March 18, 2001 and December 30, 2001, both times appealing the matter to Step 2 after being denied at Step 1.  (He filed Step 1 grievances on a few other occasions as well, but he did not fully exhaust them by proceeding through Step 2.)  Johnson's complaint included an allegation that he had exhausted available administrative remedies.[7]

---

[7]     Before turning to the substance of the exhaustion requirement, we observe that there is a threshold issue regarding whether the defendants properly raised the exhaustion issue. Though the defendants raised exhaustion in their motions for judgment on the pleadings and for summary judgment, their answer to Johnson's complaint did not raise the issue.  Johnson argues that exhaustion is an affirmative defense and points to the general rule, see Giles v. Gen. Elec. Co., 245 F.3d 474, 491-92 (5th Cir. 2001), that affirmative defenses not raised in the answer are ordinarily deemed waived.  The defendants contend that exhaustion is not an affirmative defense but is instead part of the plaintiff's cause of action.

11

Section 1997e(a) does not say how specific a prisoner's administrative grievances must be, and this court has so far given relatively little guidance regarding what a prisoner must say in his grievances to exhaust his claims properly. As a general matter, courts typically use a standard according to which a grievance should give prison officials "fair notice" of the problem that will form the basis of the prisoner's suit. See, e.g., Burton v. Jones, 321 F.3d 569, 575 (6th Cir. 2003). The parties agree on that generalized formulation but,

As Johnson accurately points out, the substantial majority of courts of appeals that have considered the question hold that exhaustion is an affirmative defense, generally reasoning that it is similar to a statute-of-limitations defense. See, e.g., Casanova v. Dubois, 304 F.3d 75, 77 n.3 (1st Cir. 2002) (citing cases). But see Steele v. Fed. Bureau of Prisons, 355 F.3d 1204, 1209-10 (10th Cir. 2003) (taking the contrary view and requiring prisoners to allege and show exhaustion of administrative remedies). Some prior decisions of this court seem to imply or assume that exhaustion is a component of the plaintiff's claim, not an affirmative defense that must be raised and proved by the defendants. See, e.g., Days v. Johnson, 322 F.3d 863, 868 (5th Cir. 2003); Wendell v. Asher, 162 F.3d 887, 892 (5th Cir. 1998); Underwood v. Wilson, 151 F.3d 292, 296 (5th Cir. 1998). But, arguably, these cases have not directly decided the question. Assuming arguendo that the question is as-yet undecided, we have no occasion to decide it here. While failure to raise an affirmative defense in the answer generally results in a waiver, noncompliance can be excused if the defendant raises the issue at a "pragmatically sufficient" time and there is no prejudice to the plaintiff. See Giles, 245 F.3d at 491-92. The defendants raised the exhaustion issue in their motion for judgment on the pleadings, and here it does not appear that Johnson was surprised in any way, as might happen when a party waits until shortly before trial to raise a new defense. Moreover, failure to plead exhaustion in the answer is especially excusable here given that the law on the topic is not clearly settled. See Foulk v. Charrier, 262 F.3d 687, 697 (8th Cir. 2001) (excusing defendant's failure to raise exhaustion in a timely manner because circuit law regarding PLRA exhaustion was unsettled at the time).

12

unsurprisingly, they differ on how much detail is required in order to provide notice of the prisoner's problem.

In deciding how much detail is required in a given case, we believe that a court must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials "time and opportunity to address complaints internally," Porter v. Nussle, 534 U.S. 516, 525 (2002). Thus, a grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit. Further, as a practical matter, the amount of information necessary will likely depend to some degree on the type of problem about which the inmate is complaining. If an inmate claims that a guard acted improperly, we can assume that the administrators responding to the grievance would want to know--and a prisoner could ordinarily be expected to provide--details regarding who was involved and when the incident occurred, or at least other available information about the incident that would permit an investigation of the matter. In contrast, a grievance in which an inmate says that his cell is habitually infested with vermin, or that the prices in the commissary are too high, could adequately alert administrators to the problem whether or not the grievance names anyone. Compare Curry v. Scott, 249 F.3d 493, 505 (6th Cir. 2001) (holding that a grievance specifically complaining of a beating at the hands of one guard did not suffice to exhaust a failure-to-protect claim

13

against another guard, not mentioned in the grievance, who stood by and watched), with Brown v. Sikes, 212 F.3d 1205, 1207–10 (11th Cir. 2000) (holding that a prisoner who knew only that he had not received prescribed medical equipment had exhausted his claim, notwithstanding that his grievance did not name anyone).

Beyond those general practical considerations, the prison system's own rules regarding grievances provide both inmates and the courts with more specific guidance. Since prisoners are generally required to follow the procedures adopted by the state prison system, the specificity requirement should be interpreted in light of the grievance rules of the particular prison system, here the TDCJ. See Strong v. David, 297 F.3d 646, 649 (7th Cir. 2002) ("[G]rievances must contain the sort of information that the administrative system requires.").[8] Thus, in deciding whether the grievance gives officials an opportunity to address the problem, we should consider whether the grievance provides the type of information that the TDCJ rules request.

The defendants raise three distinct types of exhaustion arguments on appeal: They argue that Johnson did not exhaust (1) certain of his legal theories (2) regarding certain episodes (3)

_____

[8]     The Strong opinion qualified its holding by noting that a state's procedures would be invalid if they established requirements inconsistent with the federal policies behind § 1983 and § 1997e(a). 297 F.3d at 649. In other words, a state could not make grievance rules that prevented the vindication of substantive rights.

14

against certain defendants.  We consider each in turn, and we conclude that many of Johnson's claims are unexhausted.

## A.    Which theories?

Johnson's suit contains Eighth Amendment claims, race-based Equal Protection claims, and claims for failure to protect because of sexual orientation under the Equal Protection Clause. We begin with the question of which of those three categories of claims were exhausted.

As a general matter, there is authority from several courts to the effect that a prisoner, who is of course typically uncounseled, need not present legal theories in his grievances. See, e.g., Burton, 321 F.3d at 575 ("[W]e would not require a prisoner's grievance to allege a specific legal theory or facts that correspond to all the required elements of a particular legal theory."); see also Strong, 297 F.3d at 650 (concluding that a prisoner need not present legal theories, at least as long as prison rules do not require that).  We agree.  As we discussed above, the purpose of the exhaustion requirement is to give prison administrators an opportunity to address a problem, and they can do this whether or not the prisoner tells them the constitutional provisions that the problem implicates.  Further, TDCJ rules specifically instruct inmates to provide facts, not legal terminology.

Johnson's grievances repeatedly refer to the defendants' failure to protect him from assaults and (though this was unnecessary) specifically name the Eighth Amendment. The defendants admit that the grievances exhausted Eighth Amendment claims, at least against a few defendants regarding a few instances--matters that we will discuss later. They also argue, however, that the grievances do not exhaust any of Johnson's two types of Equal Protection claims against any defendant.

Race. As to race discrimination, the defendants correctly observe that Johnson's grievances nowhere state that he was suffering racial discrimination. Indeed, his grievances do not mention his race at all. Even though Johnson need not present a full-fledged legal theory in his grievance, his grievances must alert prison officials to a problem and give them an opportunity to address it. His grievances gave them notice that there was a problem with protection from sexual assaults, but we do not think that they can be read to give notice that there was a race-related problem. See Medera v. Griffin, No. 02 C 1064, 2003 WL 132496, at *11 (N.D. Ill. Jan. 14, 2003) (holding that grievances regarding prison conditions that allegedly violated the Eighth Amendment did not exhaust an Equal Protection claim where the grievances contained "no mention whatsoever of the plaintiff's heritage, nor any references to racial slurs").[9]

---

[9] To be sure, Johnson's Eighth Amendment and Equal Protection claims are not wholly unrelated: His race, he claims,

16

Sexual orientation.  Johnson's grievances mention his sexual orientation many times.  For the most part, the references to Johnson's sexuality are intertwined with Johnson's complaints about the officials' failure to protect him from assaults.  The defendants contend that this does not necessarily indicate that Johnson was complaining that the officials were purposefully discriminating against him, by refusing to protect him, because of his homosexuality.  The grievances are certainly not as explicit as one would expect from a lawyer, but as we stated above a prisoner need not provide all of the elements of a constitutional claim as long as the grievance at least reasonably indicates a problem.  Further, Johnson's grievances do also suggest a complaint that the officials considered Johnson's sexuality: Johnson writes that members of the UCC responded to his requests for protection from rape by saying "that they feel that because I'm a homosexual I'm enticing [illegible]."  In addition, a reasonable reader could infer that the officials would not tell a heterosexual inmate that, instead of getting

---

is part of the reason why the defendants failed to protect him.  Cf. Burton, 321 F.3d at 577.  Nonetheless, these claims reflect distinct problems with prison staff, and a grievance that suggested a racial component to Johnson's situation could be expected to produce a different type of administrative response.  Cf. Porter, 534 U.S. at 525 (explaining that one purpose of the exhaustion requirement is the creation of an "administrative record that clarifies the contours of the controversy").  We do not believe that it is too much to ask that a prisoner at least suggest a racial component if he is later going to sue on that ground.

17

protection from victimization, he should "choose someone to be with." Under the circumstances, we conclude that Johnson's grievances were sufficient to give prison officials fair notice that there might have been a sexual-orientation-related aspect to Johnson's problem.

**B. Which incidents?**

Having decided which general theories Johnson may pursue, we turn next to examining which events he has exhausted.

Johnson's claim is that prison officials failed to protect him, over the course of some eighteen months, from near-constant sexual assault. Johnson's complaint, and his summary-judgment evidence, covers the repeated abuses in uncomfortable detail and lists many unsuccessful encounters with prison officials. These include face-to-face encounters with several guards who allegedly failed to take steps to protect Johnson on various occasions, correspondence with supervisory officials, and meetings with UCC committees. The defendants contend that the only exhausted claims in this case are those against two defendants, Wathen and Kuyava, as regards their involvement in the March 16, 2001 UCC. They reason that since TDCJ rules require that a Step 1 grievance be filed within fifteen days of the complained-of event, a grievance can only exhaust claims that relate to matters that occurred within the preceding fifteen days. Therefore, Johnson's March 18 Step 1 grievance could exhaust claims arising from the

18

March 16, 2001 UCC, but it could not exhaust any claims that arise from conduct before March 2001.  Johnson's December 2001 Step 1 grievance, which was also appealed through Step 2, failed to exhaust any claims, continue the defendants, because no UCC meeting occurred in the fifteen days preceding the filing of that Step 1 grievance.

Johnson did not use the formal grievance process--or, rather, he did not properly use it by both filing a Step 1 grievance <u>and</u> appealing the grievance to Step 2--until his March 18, 2001 Step 1 grievance.  We agree with the defendants that Johnson has not exhausted any claims that arise from events that occurred more than fifteen days before this grievance.  While it is true that the conditions that Johnson suffered both before and after the grievance were of the same general character, to permit the March 2001 grievance to reach back to events that transpired up to six months earlier would effectively negate the state's fifteen-day rule and frustrate the prison system's legitimate interest in investigating complaints while they are still fresh. That a condition continues does not excuse the failure to file a grievance earlier.  Accordingly, we hold that Johnson's grievances do not permit him to pursue claims regarding conduct that occurred before March 2001; in particular, this means that he has not exhausted claims related to the UCC meetings of September 6, 2000, December 13, 2000, February 14, 2001, and February 21, 2001; nor has he exhausted claims regarding his

19

encounters with Willingham, which all occurred before March 2001.[10]

Having concluded that Johnson's March 2001 grievance did not exhaust claims that involve events before the March 2001 UCC meeting, we next consider whether Johnson has exhausted claims related to conduct that occurred <u>after</u> the March 2001 grievance. The defendants contend that no such claims were exhausted because none of the three subsequent UCC meetings at which Johnson was denied protection--which occurred in September 2001, December 2001, and January 2002--was followed within fifteen days by a Step 1 grievance. In particular, Johnson's December 30, 2001 Step 1 grievance was a few days too late to reach the December 2001 UCC meeting, which was held on the 13th.

We do not agree with the defendants' argument that Johnson has not exhausted any claims that arise from events later than the March 16, 2001 UCC meeting. The March 2001 grievance alerted prison officials to the fact that Johnson was being subjected to repeated assaults and was not receiving any protection from the system, in particular a transfer to safekeeping status:

> I am writing to state that I am a homosexual who and [sic] is still being assaulted sexually, physically, mentally. I have brought this issue up to unit administration a number of times and have failed to be

---

[10] We pause to note that our holding does not mean that information regarding unexhausted events cannot be used as evidence, if relevant and otherwise admissible, in proving claims that are exhausted. <u>Cf.</u> <u>United States v. Ashdown</u>, 509 F.2d 793, 798 (5th Cir. 1975).

20

> moved to a safe location that houses other homosexuals.
> . . . Get me off this building or this unit before I am
> assaulted again. . . . I have used all the proper
> channels to resolve this problem but they simply refuse
> to listen.  Please get the warden or U.C.C. to move me
> off this building . . . . They have failed to provide me
> safety.

The grievance investigation worksheet corresponding to this Step 1 grievance summarizes the issue as "being assaulted," and the administration responded to Johnson's grievance by writing that a UCC had already been convened in response to Johnson's life-endangerment notices and had found his claims insufficient. (That is, administrators did not take Johnson's grievance as a complaint about only the prior UCC per se,[11] but rather they viewed the UCC as part of their response to the problem of being attacked.)  After the officials rejected Johnson's grievance, the same condition of confinement of which he had been complaining continued.

After one full trip through the two-step review process, Johnson later filed the December 30, 2001 Step 1 grievance, which, according to the defendants, exhausted nothing because the most recent prior UCC was on December 13, more than fifteen days earlier.  In this grievance Johnson reports that he is still "constantly" being threatened and harassed, that he is "subject

---

[11]    By way of comparison, inmates sometimes do claim that the procedures or outcome of a particular administrative hearing violated their rights.  See, e.g., Black v. Warren, 134 F.3d 732 (5th Cir. 1998); Banuelos v. McFarland, 41 F.3d 232 (5th Cir. 1995).

to being bought and sold by gang members," and that he has not been moved despite asking the staff and the UCCs for help "numerous times." Notably, the prison administration did <u>not</u> reject this grievance as being an untimely attempt to grieve the results of the December 13 UCC. <u>Cf.</u> <u>Gates v. Cook</u>, __ F.3d __, 2004 WL 1440601, at *5 & n.6 (5th Cir. June 28, 2004) (holding that prison officials could not argue that a prisoner's grievance failed to comply with procedural rules when the officials had looked past the purported technical defect and rejected the grievance for substantive reasons); <u>accord</u> <u>Riccardo v. Rausch</u>, 375 F.3d 521, 523-24 (7th Cir. 2004). Rather, their internal documents portrayed this grievance as another complaint about being attacked, and the administration rejected it on the ground that they had already answered Johnson's complaints about safety in their response to a prior Step 1 grievance that was filed shortly before the December 13 UCC meeting. Thus, the prison administration itself evidently did not understand Johnson's grievance as a complaint about the December 13 UCC meeting in particular, but instead as a complaint about a continued lack of protection.[12]

_____

[12] The grievance investigation form corresponding to the December 30 Step 1 grievance states, in the "Summary of Issue" section, "Dupl. 2002058973." This presumably means that administrators understood it to duplicate grievance # 2002058973, which was filed on December 5 and which, in turn, was summarized by administrators as "[inmate] wants protection." The grievance investigation form corresponding to the Step 2 appeal describes the issue as a complaint about being threatened and harassed.

22

As a practical matter, Johnson could not have been expected to file a new grievance every fifteen days, or each time he was assaulted (which, according to him, was virtually every day), for the entire period during which he remained unprotected in the general population. Persuasive authority holds that, in such circumstances, prisoners need not continue to file grievances about the same issue. See Sulton v. Wright, 265 F. Supp. 2d 292, 295-99 (S.D.N.Y. 2003) (holding that two grievances filed during the course of a several-year period of repeated delays in treating an inmate's injured knee sufficed to exhaust the entire course of conduct, despite the prison system's rule that grievances must be filed within fourteen days of an occurrence); Aiello v. Litscher, 104 F. Supp. 2d 1068, 1074 (W.D. Wis. 2000) (holding that when inmates have filed a grievance regarding a prison policy, they need not file grievances regarding subsequent incidents in which the policy is applied); cf. Lewis v. Washington, 197 F.R.D. 611, 614 (N.D. Ill. 2000) (holding that inmates complaining about various aspects of the conditions in their housing unit need only grieve their placement in that unit, not each of the various alleged unconstitutional conditions present in the unit; "[o]therwise the defendants could obstruct legal remedies to unconstitutional actions by subdividing the grievances . . . ."). Further, the TDCJ rules specifically direct prisoners not to file repetitive grievances about the same issue and hold out the threat of sanctions for excessive use of

23

the grievance process.  It would make little sense to require a prisoner being subjected to a frigid cell to continue to file grievances stating that the cell remains frigid, and the same principle applies here.  Cf. Wilson v. Seiter, 501 U.S. 294, 303 (1991) (referring to "the temperature he is subjected to in his cell, and the protection he is afforded against other inmates" both as "conditions of confinement" subject to the Eighth Amendment).

Given the circumstances of this case and the nature of Johnson's complaint, we do not believe that he was required to file repeated grievances reminding the prison officials that he remained subject to attack in the general population.  Johnson's grievances were sufficient to exhaust claims that arose from the same continuing failure to protect him from sexual assault.  Thus, we disagree with the defendants' suggestion that he has failed to exhaust any claims relating to the September 2001, December 2001, and January 2002 UCC meetings.[13]

---

[13]    We pause to observe that we do not here hold that a grievance filed in response to one particular incident automatically exhausts claims that arise from future incidents of the same general type.  Thus, an inmate who claims to have been beaten by guards (or, for that matter, not protected by guards) once one month and again the next month can rightfully be expected to grieve both incidents, following TDCJ's fifteen-day rule in each case.  Nor do we hold that Johnson would not be required to file additional grievances for future incidents that reflect a different problem.  For instance, Johnson's claims against Lieutenant Paul stem solely from the March 2002 incident in which Paul responded indifferently after Johnson reported being harassed in the shower.  This discrete incident reflects a different type of problem that would require a different

24

## C.   Which defendants?

Johnson has sued fifteen prison officials, but the defendants contend that he has not exhausted his claims against many of them.  In particular, they argue that a claim against a person has been exhausted only if that person was identified in the prisoner's Step 1 grievance.

We are mindful that the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation.  Cf. Brown, 212 F.3d at 1207-10 (rejecting a rule that a prisoner must always name defendants in his grievance).  But, at the same time, the grievance must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit, and for many types of problems this will often require, as a practical matter, that the prisoner's grievance identify individuals who are connected with the problem.

Non-UCC defendants.  Two of the defendants in this case, Paul and Willingham, are prison guards who are accused of failing to protect Johnson on a few discrete occasions.  The character of Johnson's formal grievances is that he is frequently being

grievance.  (Indeed, we will hold in the next section of the opinion that Johnson has not exhausted his claims against Paul.)

25

assaulted and has repeatedly but unsuccessfully sought a change in housing status through the established administrative channels. Nowhere does he mention or describe Paul or Willingham. Johnson's grievances would alert administrators particularly to problems regarding the prison's housing and classification practices, but we do not think that they can fairly be read to alert them to, or give them an opportunity to remedy, the discrete conduct that forms the basis of Johnson's claims against these two officers, which is of a different character. (In addition, as observed above, all of the conduct concerning Willingham occurred before March 2001, which is an independent reason to hold it unexhausted.)

Johnson has also sued three supervisory-level officials who never sat on a UCC: Treon, Wright, and Executive Director Johnson. Johnson specifically named Treon and Wright, but only in Step 2 grievances. The defendants contend that this is insufficient, for TDCJ rules instruct inmates not to "bring up new grievance issues on appeal." But cf. Burton, 321 F.3d at 574 (permitting a prisoner to provide "additional factual detail" at appellate stages of grievance process). Johnson's grievances did not mention Executive Director Johnson, but Johnson says that there is no need to mention the Executive Director. See Brown, 212 F.3d at 1209 (observing that "[e]veryone involved in the grievance process knows who the warden and [state prison] commissioner are"). We need not struggle with these matters

26

here, however, because we determine in Part III of our opinion that these three supervisory defendants are clearly entitled to dismissal based on qualified immunity.[14]

UCC defendants.  We held above that Johnson had not exhausted any claims related to UCC meetings before March 2001. We now ask whether, regarding the exhausted UCC meetings, Johnson's grievances adequately identified the relevant defendants.

The defendants conceded at oral argument, and we agree, that a grievance can sufficiently identify a person even if it does not provide an actual name; functional descriptions and the like- -e.g., a reference to "the guards in the shower room" on a certain date--would suffice.  Cf. id. at 1209-10 & n.4 (noting prison administrators' superior access to personnel information and records).  As we have already said, Johnson's grievances repeatedly refer to the UCC committees and their failure to believe his pleas and take measures to protect him.  This was adequate to put the prison administrators on notice that members of the UCCs were connected, indeed most closely connected, with Johnson's problem.

D.    Summary

Drawing together the threads of the three arguments considered above, we conclude that many of Johnson's claims were

_____

[14]    We note that the exhaustion requirement is not jurisdictional.  See Underwood, 151 F.3d at 294-95.

27

not exhausted and should have been dismissed.  All of his race-based Equal Protection claims are unexhausted, as are all claims against defendants Paul and Willingham.  So too are all claims related to all UCC meetings before the March 2001 meeting; in particular, Johnson may not now pursue claims against Bright and Kuyava as regards the September 6, 2000 UCC; Mooneyham and Vitolo as regards the December 13, 2000 UCC; Bowman, Boyle, and Kuyava as regards the February 14, 2001 UCC; and Vitolo and Wathen as regards the February 21, 2001 UCC.

The claims that are exhausted are Johnson's Eighth Amendment claims and his claims for failure to protect because of sexual orientation under the Equal Protection Clause against Wathen and Kuyava as regards the March 16, 2001 UCC; Wathen as regards the September 5, 2001 UCC; Bowman, Kuyava, and Ranjel as regards the December 13, 2001 UCC; and Norwood, Vitolo, and Taylor as regards the January 17, 2002 UCC.[15]

Finally, we find it unnecessary to reach a decision on exhaustion regarding the claims against Executive Director Johnson, Treon, and Wright.

### III. EIGHTH AMENDMENT CLAIMS

---

[15]     We observe that the defendants have not argued in favor of a total exhaustion rule according to which an entire lawsuit must be dismissed without prejudice when certain claims are exhausted but others are not.

28

The defendants also appeal, in No. 03-10455, the district court's denial of their motion for summary judgment on Johnson's Eighth Amendment claims.  Of course, in accordance with our rulings above, we need only consider those claims that Johnson exhausted.

## A.    Appellate jurisdiction in No. 03-10455

We begin by noting that Johnson has filed a motion to dismiss No. 03-10455 for want of appellate jurisdiction. Although a public official claiming qualified immunity can as a general matter immediately appeal a denial of summary judgment, see Mitchell v. Forsyth, 472 U.S. 511, 524-30 (1985), we lack interlocutory jurisdiction to review the district court's conclusion that the plaintiff has created a genuine issue of fact as to some matter.  See Johnson v. Jones, 515 U.S. 304, 313, 319-20 (1995).  Johnson points out that the district court's order denying summary judgment specifically stated that genuine disputes of material fact existed that precluded a ruling on the immunity defense.

As the Supreme Court explained in Behrens v. Pelletier, 516 U.S. 299 (1996), Johnson does not mean that there is no interlocutory appellate jurisdiction whenever the district court's order denying summary judgment states that fact questions remain.  Rather, Johnson means only that the district court's ruling cannot be appealed to the extent that the official seeks

29

to challenge the district court's determinations regarding the sufficiency of the summary-judgment record.  Id. at 313.  "Johnson permits [a defendant official] to claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the Harlow standard of 'objective legal reasonableness.'" Id.  Yet while the appeal will not be dismissed, we are nonetheless required to limit our review along the lines described in Johnson and Behrens.  That is, we may not consider any of the defendants' arguments that challenge the district court's assessment that certain facts are sufficiently supported in the summary-judgment record.  This turns out to be an important limitation in this case, as much (though not all) of the defendants' argument asks us to contradict one of the district court's determinations regarding the sufficiency of the evidence.

**B.   Analysis**

    1.   Principles

The Supreme Court formally recognized and described the Eighth Amendment failure-to-protect theory in Farmer v. Brennan:

> [P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners. . . . [G]ratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e], any more than it squares with evolving standards of decency.  Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

30

511 U.S. 825, 833-34 (1994) (second and fifth alterations in original) (citations and internal quotation marks omitted). The Court went on to explain that, to succeed on such a claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison officials acted with "deliberate indifference" to the inmate's safety. Id. at 834. An official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. The official's knowledge of the risk can be proven through circumstantial evidence, such as by showing that the risk was so obvious that the official must have known about it. Id. at 842. Finally--and significantly for purposes of this case--there is no liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

The defendants are entitled to qualified immunity unless their conduct was not only illegal but also violated clearly established law such that their behavior was objectively unreasonable. To be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The law can be clearly

31

established even without prior cases that are on all fours with the present case, "so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." Hope v. Pelzer, 536 U.S. 730, 740 (2002) (internal quotation marks omitted). Of course, the defendant's conduct cannot constitute a violation of clearly established law if, on the plaintiff's version of the facts, there is no violation at all. We therefore initially ask whether the challenged conduct actually presents a violation of federal law. See Saucier v. Katz, 533 U.S. 194, 201 (2001); Siegert v. Gilley, 500 U.S. 226, 232 (1991).

With the necessary qualification that we may not in this appeal review the district court's conclusions that genuine issues of fact remain, see supra Part III.A, we exercise de novo review over the district court's legal ruling that, on the set of facts that it assumed, the defendants are not entitled to qualified immunity. See Lemoine v. New Horizons Ranch & Ctr., Inc., 174 F.3d 629, 634 (5th Cir. 1999).

2. Application

Most of the defendants' brief in No. 03-10455 is devoted to showing that Johnson "failed to create a fact question over whether any [defendant's] conduct violated Johnson's constitutional rights or whether any [defendant's] conduct was objectively unreasonable." In particular, they repeatedly seek to demonstrate that, based on the information before them when

32

they acted, either they did not realize the danger Johnson faced or they had reason to disbelieve Johnson's complaints of repeated rape and abuse. See Farmer, 511 U.S. at 844 (explaining that prison officials can try to prove that they "did not know of the underlying facts" or "believed (albeit unsoundly) that the risk . . . was insubstantial or nonexistent"). That particular argument, whether sound or not, is beyond the purview of this appeal. The Supreme Court expressly stated in Farmer that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact." Id. at 842 (emphasis added). The district court's April 9 order, while less detailed than ideal, clearly stated that there remained a fact question as to the defendants' knowledge: "Whether any Defendant had the requisite knowledge of a substantial risk of harm is a question of material fact that [this] Court cannot resolve on the current record." As explained earlier, we lack jurisdiction to review the district court's assessment that a genuine issue of fact exists as to some matter, and therefore we cannot look behind the ruling that Johnson presented sufficient evidence for a fact-finder to conclude that the defendants knew of the risk. See Smith v. Brenoettsy, 158 F.3d 908, 913 (5th Cir. 1998) (dismissing an interlocutory appeal where there was a factual dispute regarding whether defendant prison officials were aware of the danger to the inmate's safety). Accordingly, we must reject this aspect of the defendants' argument on appeal.

33

Nonetheless, our inability to second-guess the district court's conclusion that there existed a fact issue regarding the defendants' awareness of the risk does not end our inquiry. Under Farmer, prison officials violate the Eighth Amendment only if they are both aware of a substantial risk to inmate safety and fail to respond properly. The Farmer Court emphasized that there is no Eighth Amendment violation if the official "responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844. Although the district court's opinion in this case clearly stated that there were fact issues regarding the defendants' knowledge of the risk, the opinion did not directly address the material fact issues (if any) that existed with respect to how the defendants responded to the risk. When the district court fails to set forth carefully the factual disputes that preclude summary judgment, the Supreme Court has recognized that "a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." Johnson, 515 U.S. at 319. Even assuming that all of the defendants knew of the substantial risk to Johnson's safety, there would be no Eighth Amendment violation if the undisputed facts in the record demonstrated that they responded reasonably. Moreover, they would be entitled to qualified immunity unless clearly established law showed that their response was insufficient. Accordingly, we must consider

34

whether some of the defendants might be entitled to qualified immunity on those grounds.

Non-UCC defendants. We concluded above that all claims against non-UCC defendants Paul and Willingham were unexhausted. We pretermitted deciding the exhaustion issue as regards Executive Director Johnson, Treon, and Wright in favor of ruling on qualified immunity, to which we now turn. In addition to discharging their usual duties of overseeing and reviewing those prison operations for which they were responsible, these supervisory officials had notice of Johnson's plight through various letters and life-endangerment forms. Like all prison officials, these supervisory defendants have a duty to take reasonable measures to protect inmates. See Farmer, 511 U.S. at 832. Yet given the size of the operation that they oversee, they cannot be expected to intervene personally in response to every inmate letter they receive. The record in this case shows that they responded to Johnson's complaints by referring the matter for further investigation or taking similar administrative steps. This was a reasonable discharge of their duty to protect the inmates in their care. Given that neither the Supreme Court nor this court has delineated the contours of what supervisory officials must do on pain of personal liability, their conduct did not violate clearly established law of which reasonable officers should have known. Therefore, they are entitled to qualified immunity.

35

UCC defendants. We held in Part II that Johnson had not exhausted some of his claims arising from certain UCC meetings but that he had exhausted claims relating to the September 2001, December 2001, and January 2002 UCC meetings (in addition to the March 2001 meeting, which the defendants concede was exhausted). We now consider whether the defendants involved in those meetings are nonetheless entitled to qualified immunity.

Certain UCCs responded to Johnson's claims by taking action such as ordering further investigation or separating Johnson from a particular inmate who had been threatening him. Those responses were unavailing, but they may well have been reasonable methods of addressing the risk that Johnson faced. See id. at 844 (observing that officials are not liable if they take reasonable measures, "even if the harm ultimately was not averted"). The most diligent prison administrators cannot guarantee complete safety. But unlike the UCCs that at least took some (unsuccessful) measures to protect Johnson, the particular UCC committees that we are now considering--March 2001, September 2001, December 2001, and January 2002--did nothing in response to Johnson's claims except (according to Johnson) tell him to fight off his attackers, despite the committee members' awareness (which awareness we must assume in this appeal) of the substantial risk that Johnson faced. Although it is not clear exactly what type of action an official is legally required to take under Farmer, the Supreme Court's

36

opinion does make it abundantly clear that an official may not simply send the inmate into the general population to fight off attackers.  See id. at 832-33 (explaining that jailers must "take reasonable measures to guarantee the safety of the inmates" and "are not free to let the state of nature take its course" (internal quotation marks and citation omitted)).  (And Farmer itself is factually similar to today's case in that it involved an effeminate prisoner who was raped after he was put in the general prison population.  Id. at 829-30.)  The defendants, at least according to Johnson, repeatedly expressed the view that Johnson must "learn to f*** or fight," which runs directly counter to Farmer's directive.  Given the facts that we must assume for purposes of this appeal, this was not a reasonable response and it indeed contravenes clearly established law.  Moreover, although the defendants contend that no single person acting alone could have granted Johnson's requests--the UCC makes recommendations to the state classification authority by majority vote of its three members, so nobody in particular is responsible, they say--that does not transform this deliberately indifferent failure to take any action into a reasonable method of discharging their duty to protect the prisoners in their care.  Accordingly, we affirm the district court's denial of qualified immunity to Wathen and Kuyava as regards the March 16, 2001 UCC; Wathen as regards the September 5, 2001 UCC; Bowman, Kuyava, and Ranjel as regards the December 13, 2001 UCC; and Norwood, Vitolo,

37

and Taylor as regards the January 17, 2002 UCC.[16]

## IV. EQUAL PROTECTION CLAIMS

Johnson relinquished Equal Protection claims against Executive Director Johnson, Treon, Wright, Mooneyham, Willingham, and Paul. After further subtracting claims that we deemed unexhausted in Part II, we are left with Johnson's claims for failure to protect because of sexual orientation against the participants in the March 2001, September 2001, December 2001, and January 2002 UCCs.

### A.  Appellate jurisdiction

Johnson has also filed a motion to dismiss No. 03-10505, the defendants' appeal from the district court's denial of judgment on the pleadings. The defendants moved for judgment on the pleadings in November 2002 and, while that motion was still pending, moved for summary judgment in January 2003. The first motion largely involved Equal Protection claims, while the second addressed Eighth Amendment claims. The district court denied the motion for summary judgment in April 2003 and, a week later, denied the motion for judgment on the pleadings. The defendants timely filed a notice of appeal regarding the denial of summary

---

[16] We observe as well that Johnson appeared before a UCC in April 2002. It is not clear whether Johnson is pursuing claims related to this meeting, at which Johnson was transferred to a different prison. Defendant Wathen was a member of this committee. If Johnson does mean to pursue such claims, we would hold that Wathen's response was a reasonable one and that the immunity defense should be upheld.

38

judgment and later timely filed a notice of appeal regarding the denial of judgment on the pleadings.  Johnson argues that, under the circumstances of this case, the second-filed appeal does not qualify as an appealable decision under the collateral order doctrine.

Johnson acknowledges that, as a general matter, rulings denying qualified immunity--whether the ruling occurs at the pleadings stage or at summary judgment--are immediately appealable under the collateral order doctrine's exception to the final-judgment rule.  Moreover, Johnson recognizes that the Supreme Court's decision in Behrens generally permits a public official to bring multiple qualified-immunity-based interlocutory appeals in the course of a single case.  See 516 U.S. at 306-07 (permitting a public official to bring an interlocutory appeal of the denial of his motion for summary judgment after the court of appeals had already affirmed and remanded on a previous interlocutory appeal of the denial of his motion to dismiss).  Nonetheless, Johnson argues that those general principles are inapplicable to the unusual circumstances of this case.  A motion to dismiss or for judgment on the pleadings on qualified immunity grounds is in the usual case immediately appealable, Johnson reasons, only because the public official would otherwise lose his entitlement to be free from discovery; an appeal would do no good if it came only after the official had already been subjected to discovery during summary-judgment proceedings.  But

39

in this case, Johnson points out, (some) discovery has already occurred and the case has moved to the summary-judgment stage. The justification for the immediate appeal of the motion to dismiss is therefore lacking in this case, he contends.

We conclude that Johnson's motion is not well-taken. The Supreme Court has announced the general rule that orders denying qualified immunity are treated as "final" and appealable, and we think it improper to carve out an exception that responds to the precise timing of the district court's rulings. The defendants' motion for judgment on the pleadings on the Equal Protection claims effectively asserted an immunity from discovery, from suit, and from liability. That some discovery did take place as the proceedings moved into the summary-judgment stage does not make the court's denial of the motion for judgment on the pleadings any less conclusive as regards the motion's request for immunity from trial and from liability. See Behrens, 516 U.S. at 306-09; Mitchell, 472 U.S. at 526-28; cf. Matherne v. Wilson, 851 F.2d 752, 756 (5th Cir. 1988) (holding that an official who failed to bring any interlocutory appeal could raise qualified immunity in a post-verdict appeal of the final judgment, even though the only aspect of his immunity that could still be vindicated at that stage was immunity from liability).

It also bears noting that the reason for the unusual course of proceedings cannot be attributed to any improper conduct or neglect on the part of the defendants. They properly filed a

motion for judgment on the pleadings that largely concerned the plaintiff's Equal Protection claims.  While waiting for a ruling, the defendants then filed a motion for summary judgment, which mostly involved the plaintiff's Eighth Amendment claims.  There was nothing improper about how the defendants proceeded.  The district court ruled first on the motion for summary judgment and later concluded (perhaps erroneously) that the earlier motion was therefore moot.  Either motion would, by itself, ordinarily support an interlocutory appeal.  This case presents no reason to muddle the otherwise clear right of a public official to bring an interlocutory appeal of a denial of qualified immunity.[17]  We will therefore consider the merits of the appeal.

## B.    Analysis

The district court's denial of the defendants' Rule 12(c) motion for judgment on the pleadings is reviewed de novo.  Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002).  The standard for dismissal under Rule

---

[17]    An instructive contrast with today's case is presented by Armstrong v. Texas State Board of Barber Examiners, 30 F.3d 643 (5th Cir. 1994).  There, the defendant's motion for summary judgment simply repeated the same pleadings-based arguments that the defendant had earlier raised in an unsuccessful motion to dismiss, which the defendant did not appeal.  The panel concluded that the defendant was merely trying to circumvent the long-elapsed deadline for filing an appeal of the denial of the motion to dismiss, and it dismissed the appeal.  Id. at 644.  In today's case, by contrast, the defendants' two motions rely on somewhat different grounds.  Further, both appeals were timely filed, so it cannot be said that the defendants are trying to evade any deadline.

12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6). Id. at 313 n.8. We accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff. Id. at 312-13. The motion to dismiss should not be granted unless the plaintiff would not be entitled to relief under any set of facts that he could prove consistent with the complaint. Id. at 313.

At the outset, there is some dispute regarding whether Johnson's complaint should be measured against a heightened pleading standard rather than the normal Rule 8(a) standard, which requires only a "short and plain statement of the claim." In our decision in Schultea v. Wood, 47 F.3d 1427 (5th Cir. 1995) (en banc), this court modified our prior practice of requiring heightened, detail-oriented pleading in § 1983 cases against public officials. After Schultea, a plaintiff no longer needs to "anticipate the [qualified immunity] defense in his complaint at the risk of dismissal under Rule 12." Id. at 1430.[18] The considerations that had led to the adoption of heightened pleading would henceforth be satisfied, the court held, through the device of a detailed Rule 7 reply, which the district court could order on the defendant's motion or sua sponte. Id. at 1433. No such Rule 7 reply was requested or ordered in this

---

[18] Schultea nonetheless cautioned that, in making his "short and plain statement of his complaint" under Rule 8, the plaintiff may not rest on "conclusions alone." 47 F.3d at 1433.

42

case, and the defendants have not appealed the district court's decision not to require one. As we have observed already, Johnson's complaint is quite detailed and factually explicit, and the defendants' answer was in the nature of a blanket denial.

Notwithstanding that there was no Rule 7 reply, the defendants contend that the standards for Rule 7 replies should govern instead of the rules characteristic of notice-pleading under Rule 8(a). Their reasoning is that the local rules for the Northern District of Texas disfavor motions for a more definite statement and that, according to their own knowledge and their conversations with court personnel, motions for a Rule 7 reply are treated the same way. Johnson aptly responds to the defendants' contentions by citing cases in which courts in the Northern District have granted motions requesting Rule 7 replies. If the district court were flouting Schultea--which we presume our district courts would not do--the defendants should have filed a motion for a Rule 7 reply and appealed its denial. As they did not, we will apply the ordinary rules that govern the sufficiency of complaints.

2.   Whether the complaint adequately stated a claim

Turning to the sufficiency of the complaint, the defendants make three arguments in support of their view that Johnson's pleadings failed to allege any Equal Protection violations. If Johnson has indeed failed to allege a violation, then of course there can be no violation of clearly established law that would

43

overcome qualified immunity.  See Siegert, 500 U.S. at 232.  We consider each of the defendants' criticisms of the complaint in turn.

First, the defendants argue that Johnson's pleadings fail because he did not allege that the prison officials' classification decisions were not rationally related to any legitimate penological interest.  It is important to point out that the defendants themselves have not attempted to articulate any legitimate interests that could justify giving less protection to homosexual inmates.  Rather, their position in this case has consistently been that they did not in fact act on that basis.  Nonetheless, they contend that there is a pleading requirement that the plaintiff must allege in his complaint the lack of any rational relationship to a legitimate penological interest.  Although they are correct that the prisoner, not the state, bears the burden of proving that a challenged policy is invalid because it does not bear a rational relationship to legitimate objectives, Overton v. Bazzetta, 539 U.S. 126, 132 (2003), that does not necessarily mean that the prisoner's complaint must allege the absence of such a relationship on pain of dismissal.  Cf. Turner v. Safley, 482 U.S. 78, 89 (1987) (stating that "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it" (internal quotation marks omitted and emphasis added)).  In any event, Johnson's complaint does include

44

statements that the defendants subjected him to "an arbitrary and irrational classification" and acted out of "hostility and animus."  If a plaintiff's complaint must deny any rational relationship to legitimate penological aims even when those aims have not been articulated, Johnson's complaint satisfies the requirement.

Second, the defendants contend that, as mere comments alone do not violate the Equal Protection Clause, Johnson has not alleged that he has suffered any actionable discriminatory treatment.  This argument misconstrues the nature of Johnson's claim.  He does not contend that the comments made by certain defendants are themselves actionable.  Rather, his complaint repeatedly alleges that he was denied protection because of his sexual orientation; the comments are relevant because they tend to reveal the defendants' reasons for their actions in denying him safekeeping.  See Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999) (explaining that while an official's use of racial epithets "without harassment or some other conduct that deprives the victim of established rights . . . does not amount to an equal protection violation," the use of epithets is "strong evidence" that the official's actions are racially motivated).

Third, the defendants argue that the complaint fails to identify any non-homosexual prisoners who were similarly situated but were treated better.  This argument is unavailing for several reasons.  Johnson's complaint did contain general allegations to

45

the effect that he qualified for safekeeping status but was treated differently than other vulnerable inmates because of his sexual orientation. He alleged, for instance, that the defendants "treated him differently than other similarly situated inmates based on their hostility and animus towards non-aggressive gay men."[19] It is unclear how a prisoner is supposed to possess identifying information regarding other inmates' treatment at the complaint stage. But, in any event, evidence of the type the defendants request is not essential to the claim. In most cases, a plaintiff lacks direct evidence of intentional discrimination, and he therefore will try to rely on evidence that two groups received different treatment, which can support an inference that the decisionmaker purposefully engaged in discrimination. But those kinds of inference-producing comparisons are unnecessary where the § 1983 plaintiff has direct evidence of discriminatory motive. See Wallace v. Tex. Tech Univ., 80 F.3d 1042, 1047-48 (5th Cir. 1996). Indeed, Johnson's

---

[19] The defendants at one point assert that "[a]ll of Plaintiff's allegations regarding equal protection are made on 'information and belief,'" and they argue that such allegations are improper. It is inaccurate to say that "all" of the allegations are so phrased. The only "information and belief" allegations related to this subject are a few that concern whether the defendants have a "custom and practice" of denying safekeeping to vulnerable black and homosexual inmates. Further, "information and belief" pleadings are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant. See 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1224 (2d ed. 1990).

complaint contains detailed allegations that, if true, would constitute direct evidence that the defendants treated Johnson differently in making their decisions and did so because of his status.[20]  Leaving aside the question whether identifying information about other inmates would even be available to a plaintiff at the pleading stage, we do not believe that a plaintiff's complaint must plead the circumstantial case that the defendants are requesting.  Cf. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511-12 (2002) (holding that a Title VII plaintiff need not plead facts showing a prima facie case of discrimination under McDonnell Douglas and remarking that it would be "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to

---

[20]     Direct evidence includes statements revealing that an improper criterion--here sexual orientation--played a part in the decisionmaking process.  See Fabela v. Socorro Indep. Sch. Dist., 329 F.3d 409, 415 (5th Cir. 2003); see also Propst v. Leapley, 886 F.2d 1068, 1071 (8th Cir. 1989) (describing prison official's statement that disciplinary committee is "inclined to be more lenient to blacks" as "highly probative" direct evidence of intentional discrimination in violation of the Equal Protection Clause).  Johnson's complaint alleges that various defendants made remarks that reveal that they acted on improper criteria when they denied him safekeeping status.  See, e.g., Complaint at ¶ 33 ("We don't protect punks on this farm."), ¶ 55 ("There is no reason why Black punks can't fight and survive in general population if they don't want to f***."), ¶ 86 ("You like this . . . . I don't think you need no safekeeping.").

prove to succeed on the merits if direct evidence of discrimination is discovered.").[21]

### 3. Clearly established law

The defendants contend that the law is not clearly established regarding (as they phrase the question presented in this case) "whether the use of race or sexual orientation as a factor in state prison classification decisions violates the

---

[21] The defendants address Johnson's Equal Protection claims primarily in their brief in No. 03-10505, the appeal from the denial of the motion for judgment on the pleadings. Naturally, the arguments in that brief--which we have been addressing in this part of the opinion--concern only Johnson's pleadings, not his summary-judgment evidence. At the end of their brief in No. 03-10455, the separate appeal from the denial of the motion for summary judgment, which mostly pertains to the Eighth Amendment, the defendants incorporate by reference the pleadings-based Equal Protection arguments from the other brief. The defendants' brief in No. 03-10455 then purports to argue, in a few sentences without any citations to authorities or the record, that Johnson has also failed to provide sufficient evidence to survive summary judgment on his Equal Protection claims. This briefing on the evidentiary support for the Equal Protection claims (as opposed to the adequacy of the pleadings) is likely inadequate to present the issue. See L & A Contracting Co. v. S. Concrete Servs., Inc., 17 F.3d 106, 113 (5th Cir. 1994). In any event, the result would not differ if summary-judgment standards were applied to the Equal Protection claims. Johnson's affidavit recounts the same inflammatory statements alleged in his complaint, which constitute direct evidence. The defendants point out that a couple of the defendants--including Vitolo, a defendant at issue here--did not make such comments. Yet Johnson's affidavit says that Vitolo laughed during the meeting when one of the other UCC members said that Johnson did not need protection from rape because he liked having sex with men. Further, Johnson had filed a motion to compel disclosure of statistics on safekeeping that might provide the circumstantial evidence of intentional discrimination that the defendants fault him for not employing. Johnson's response to the motion for summary judgment included a Rule 56(f) affidavit that alerted the district court to the pendency of his request for this information.

48

Equal Protection Clause, when the use is rationally related to a legitimate penological interest." No Supreme Court or Fifth Circuit case, they say, has considered the extent to which sexual orientation can be considered in housing classifications.

The defendants' manner of phrasing the issue is inapt. First, while it is somewhat uncertain to what extent sexual orientation can legitimately be taken into account in fashioning prison housing policies,[22] the defendants in this case deny that they took Johnson's race and orientation into account. That is, they do not say that such status-based decisionmaking would be justified because of legitimate countervailing penological aims-- as they would need to say in a case involving a policy of housing all black or all homosexual inmates together--but rather they say that they made their decisions based on a status-neutral determination that Johnson was not unusually vulnerable.

Second, if they actually did deny Johnson protection because of his homosexuality, as Johnson alleges and as we must assume for purposes of analysis, that decision would certainly not effectuate any legitimate interest. See Farmer, 511 U.S. at 833 ("[G]ratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e]." (second

---

[22] We observe that the Supreme Court has granted certiorari to decide whether a prison's policy of segregating incoming prisoners by race for a period of sixty days violates the Equal Protection Clause. See Johnson v. California, 321 F.3d 791 (9th Cir. 2003), cert. granted, 124 S. Ct. 1505 (Mar. 1, 2004).

alteration in original) (internal quotation marks omitted)).  It is clearly established that all prison inmates are entitled to reasonable protection from sexual assault.  See id. at 832-34. (As it happens, the abused inmate in Farmer was a feminine-looking preoperative male-to-female transsexual.)  Neither the Supreme Court nor this court has recognized sexual orientation as a suspect classification [or protected group]; nevertheless, a state violates the Equal Protection Clause if it disadvantages homosexuals for reasons lacking any rational relationship to legitimate governmental aims.  Romer v. Evans, 517 U.S. 620, 631-32 (1996).  The defendants have not attempted to argue that according homosexuals less protection than other inmates would advance any legitimate aim.  Thus, we conclude that Johnson has alleged conduct that would be unreasonable in light of law that was clearly established at the time of the alleged events.

## V. CONCLUSION

Johnson's motions to dismiss Nos. 03-10455 and 03-10505 are DENIED.  We REVERSE the district court's judgment to the extent that it concluded that Johnson had exhausted: race-based Equal Protection claims; claims against defendants Paul and Willingham; claims against Bright and Kuyava as regards the September 6, 2000 UCC; claims against Mooneyham and Vitolo as regards the December 13, 2000 UCC; claims against Bowman, Boyle, and Kuyava as regards the February 14, 2001 UCC; and claims against Vitolo and Wathen

50

as regards the February 21, 2001 UCC.  <u>See</u> <u>supra</u> Part II.D. Turning to the exhausted claims, we also REVERSE the district court's judgment to the extent that it denied qualified immunity to Executive Director Johnson, Treon, and Wright.  The district court's judgment is otherwise AFFIRMED.  The case is REMANDED to the district court, for dismissal of the claims listed above and for further proceedings on the remaining claims.

Each party shall bear its own costs.


MOTIONS DENIED; AFFIRMED IN PART, REVERSED IN PART, AND REMANDED