RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0195p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

DARRELL SIGGERS,

          *Plaintiff-Appellant,*

    *v.*

ELLEN CAMPBELL; ANDREW JACKSON; N.
MINTON; PATRICIA CARUSO,

          *Defendants-Appellees.*

No. 09-2404

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-12495—Marianne O. Battani, District Judge.

Decided and Filed: July 27, 2011

Before: MOORE, COLE, and ROGERS, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Darrell A. Siggers, New Haven, Michigan, pro se.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Michigan prisoner Darrell Siggers filed this lawsuit against several Michigan prison officials, alleging First Amendment retaliation and conspiracy to violate his constitutional rights, among other things. He claims that the defendants improperly rejected his incoming mail and filed two false misconduct reports against him. In an opinion on December 10, 2008, the district court dismissed most of Siggers's claims on the ground that they were unexhausted, leaving only Siggers's "claims against Campbell relating to the September 12, 2006, mail rejection." Dist. Ct. Dkt. ("Doc.") 46 (Opinion and Order at 12). On September 25,

2009, the district court granted summary judgment against Siggers on these claims, as well. Siggers now appeals. We **AFFIRM** the district court's December 10, 2008, dismissal, but we **REVERSE** the district court's grant of summary judgment against Siggers on the retaliation claim against Campbell because Siggers has never received any of the discovery materials that he requested on September 24, 2007, making it premature for the district court to rule on the merits of Campbell's summary judgment motion. We **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

Darrell Siggers is serving a life sentence in Michigan for first-degree murder and carrying or possessing a gun while committing or attempting to commit a felony. He filed this 42 U.S.C. § 1983 suit against four prison officials on June 11, 2007, alleging several violations of the First and Fourteenth Amendments to the U.S. Constitution and the Fair and Just Treatment Clause of the Michigan Constitution, Art. I, Sec. 17. The defendants are: Ellen M. Campbell, a mailroom clerk at the Mound Correctional Facility in Michigan; Andrew J. Jackson, the warden of the Mound facility; N. Minton, a Lieutenant at the Mound facility; and Patricia L. Caruso, the Director of the Michigan Department of Corrections. Campbell, Jackson, and Minton are sued in their individual and official capacities; Caruso is sued only in her official capacity. Siggers's claims against these individuals are as follows: (1) Campbell violated his rights by improperly rejecting his incoming mail and improperly intercepting and opening his outgoing mail on numerous occasions, Doc. 1 (Complaint at ¶ 56); (2) Minton wrote "bogus and unsubstantiated" misconduct reports against him, improperly put him in "the hole," and caused him to be transferred improperly to another prison, *id.* at ¶ 58; (3) Campbell and Minton conspired to retaliate against him for exercising his right to access the courts[1], *id.* at ¶ 60; (4) Jackson violated his rights "by complicity and acquiescence in the actions of [] Campbell and Minton," *id.* at ¶ 62; and (5) Carsuo violated his rights because, "by

---

[1]This is a reference to a lawsuit Siggers filed in 2001 in which he alleged a different form of retaliation and won a judgment against the defendant in November 2005 in the amount of $219,000. This court permitted Siggers to bring these claims to trial in June 2005. *See Siggers-El v. Barlow*, 412 F.3d 693 (6th Cir. 2005) (affirming the denial of the defendant's motion for summary judgment).

virtue of Respondent [*sic*] Superior/Vicarious Liability, [she] is responsible for the actions of [] Campbell, Minton and Jackson," *id.* at ¶ 64. Over the course of two decisions, the district court dismissed all of Siggers's claims, as discussed in greater detail below.

## A.  Michigan's Regulation Of Prisoner Mail And Property

The basic facts behind Siggers's claims involve the prison's rules regarding the types of mail that may be sent and received by prisoners. Mail is highly regulated in the Michigan prison system. Policy Directive 05.03.118[2] contains the primary set of rules; in general, prisoners may "send and receive uncensored mail to or from any person or organization unless the mail violates this policy [directive] or Administrative Rule 791.6603." Michigan Department of Corrections Policy Directive ("P.D.") 05.03.118, ¶ D (effective 6/6/05). Mail may be prohibited "if it is a threat to the security, good order, or discipline of the facility, may facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner." *Id.* "This includes . . . 3. Mail containing physical contraband, which is defined as any property that a prisoner is not specifically authorized to possess or that is from an unauthorized source. This includes postage stamps, except that a prisoner may receive a single stamped self-addressed envelope from an attorney, a court or a legitimate religious organization." *Id.*

With respect to a prisoner's outgoing mail, "[g]eneral population prisoners . . . shall be permitted to send sealed mail, subject to [several paragraphs in this directive]." P.D. 05.03.118, ¶ R (effective 6/6/05).

> Outgoing mail of *any* prisoner may be opened and inspected if it is determined by the facility head or designee that there are reasonable grounds to believe the mail is being sent in violation of Paragraph D. However, mail which is clearly identified as being sent to the business address of one of the following may be sealed by the prisoner and shall not be opened or otherwise inspected by staff prior to mailing . . . :

---

[2]A newer version of this directive went into effect on September 14, 2009.

1.   A licensed attorney . . . .
2.   State or federal courts.
3.   Federal, state or local public officials.
4.   The Director or any other Central Office staff.
5.   Staff at the institution in which the prisoner is housed.

P.D. 05.03.118, ¶ S (effective 6/6/05) (emphasis in original).

Incoming mail is similarly regulated. Prisoners may elect to have incoming legal mail receive special handling, but "[a]ll incoming mail that is *not* receiving special handling . . . shall be opened . . . and inspected . . . to determine if it contains money, controlled substances or other physical contraband. All physical contraband shall be confiscated prior to delivery of the mail to the prisoner. The mail's written content also shall be skimmed and, if it appears from skimming the content that the mail may violate this policy, the item shall be read to determine if it is allowed." *Id.* at ¶ CC (emphasis in original). "All incoming mail from one prisoner to another shall be read." *Id.* When a prisoner elects to receive special handling of legal mail, however, that mail "shall be opened and inspected for money, controlled substances and other physical contraband in the prisoner's presence. The content of the mail shall not be read or skimmed." *Id.* at ¶ EE.

Many other types of incoming mail are prohibited. "Whenever mail addressed to a prisoner is believed to be in violation of this policy, a Notice of Package/Mail Rejection (CSJ-316) shall be completed and promptly sent to the prisoner. The Notice shall identify the specific item believed to be in violation of this policy and why the item is believed to be in violation." P.D. 03.05.118, ¶ JJ (effective 6/6/05). Furthermore, if the prisoner disagrees with the Notice, he or she is entitled to a hearing:

> Unless the prisoner waives his/her right to a hearing in writing, and the prisoner *and* staff agree on the appropriate disposition of the mail, a prompt hearing shall be conducted pursuant to Administrative Rule 791.3310 to determine if the mail violates this policy for the reason(s) identified in the Notice of Package/Mail Rejection and, if so, the appropriate disposition of the mail. . . .

If a hearing is conducted, an Administrative Hearing Report (CSJ-144) shall be completed by the hearing officer. . . .

*Id.* at ¶¶ KK–LL (emphasis in original).  After this, "[a] prisoner who disagrees with the outcome of a hearing may file a grievance as set forth in P.D. 03.02.130 'Prisoner/Parolee Grievances[.]'"  *Id.* at ¶ SS.

Beyond these rules, P.D. 04.07.112,[3] which governs "Prisoner Personal Property," is also relevant.  "Subject to other limitations set forth in this policy, prisoners may purchase, possess and wear personal clothing, and purchase and possess other personal property items, only as set forth in [several attachments to P.D. 04.07.112]."  P.D. 04.07.112, ¶ D (effective 11/15/04).  Among the permitted forms of property is legal property, which includes

1.     Books, photographs, diagrams, documents, pleadings and any other written materials reasonably necessary to a prisoner's pending litigation, or reasonably necessary to another prisoner's pending litigation provided there is a current, valid agreement for legal assistance with the other prisoner in accordance with PD 05.03.116 "Prisoners' Access to the Court and Legal Assistance" and applicable Director's Office Memoranda. . . .

*Id.* at ¶ M.  It also includes "3.  Example or sample pleadings that will assist in litigation."  *Id.*  In 2002, the Administrator of what was then the Department's Office of Policy and Hearings, Richard B. Stapleton, sent an email to all wardens in the Michigan prison system interpreting P.D. 04.07.112 to clarify "when a prisoner can receive through the mail motions, briefs, pleadings and similar legal documents in which another prisoner is identified as a party."  Doc. 19-4 at 2 (Stapleton Email).  Stapleton instructed the wardens as follows:

Please advise mail room staff and other appropriate staff at your facility that such items fall within the definition of "legal property" contained within PD 04.07.112 "Prisoner Personal Property".  These documents, if received in the mail for a prisoner at your facility, cannot be rejected solely on the basis that another prisoner is identified as a party.  This is

---

[3]A newer version of this directive went into effect on March 21, 2011.

true even if there is no authorized legal assistance agreement between the prisoners involved.  There must be other clear proof that the documents violate Department policy.

*Id.*

## B.  Siggers's Notices Of Mail Rejection And Major Misconduct Reports

Siggers claims that before and after he was transferred to the Mound Correctional Facility in September 2004, he "had been receiving legal briefs and documents from friends in society and other prisoners."  Doc. 1 (Complaint at ¶ 8).  Things changed in June 2005, however, when this court ruled in his favor in a retaliation lawsuit he had brought against a prison official.  *Siggers-El v. Barlow*, 412 F.3d 693 (6th Cir. 2005) (affirming the denial of the defendant's motion for summary judgment).  This decision permitted Siggers to proceed to a jury trial, and Siggers claims that after this decision, Campbell "began rejecting legal briefs and documents sent to [him] from other prisoners and friends in society."  Doc. 1 (Complaint at ¶ 10).  We summarize the facts surrounding these eight rejections, along with two major misconduct reports filed against Siggers, as follows:

> **September 6, 2005—Rejection.**  "Campbell issued Plaintiff a rejection notice for a legal brief sent to Plaintiff from a fellow inmate."  Doc. 1 (Complaint at ¶ 11).  The Notice relies on the fact that the "prisoners do not have [a] legal agreement," and therefore the brief "does not meet [the] criteria for allowable legal property per policy 04.07.112 sec. M." *Id.* at Exhibit A.  Siggers gave Campbell the Stapleton Email and stated, "In light of the attached [email], I am respectfully requesting that you please promptly forward me the brief you rejected, or otherwise set the matter for an administrative hearing, in accordance with the prisoner mail policy."  *Id.* at Exhibit C.  Campbell responded by stating that "[t]his memo is from 2002 and does not supercede this policy.  I have notified [Resident Unit Manager ("RUM")] Randall-Owens that you want a hearing."  *Id.*  The rejection was upheld in the administrative hearing, after which Siggers was advised to bring the issue up at a prisoners' meeting, known as a Warden's Forum, with the Warden.  *Id.* at ¶ 14.  When Siggers did so, Warden Jackson stated that he would review the policy at issue with the mailroom staff to ensure compliance, but that to the extent this presents personal issues, the forum was not the appropriate

place to bring them up, and future attempts to do so would result in "remedial action." *Id.* at Exhibit D.

**October 10, 2005—Rejection.** Campbell rejected two envelopes containing twelve pages of legal documents plus the "Table of Contents, Index of Authorities, Exhibits/Conclusion," all apparently belonging to the sender. Doc. 1 (Complaint at Exhibit D-1). These were rejected under P.D. 04.07.112 because the "Prisoners do not have legal assistant agreement nor does this mail meet criteria for allowable legal property * note: I have shown this to Warden Jackson." *Id.*

**October 11, 2005—Rejection.** Campbell rejected three pages of legal documents belonging to another prisoner. Doc. 1 (Complaint at Exhibit D-2). Her reason for rejecting this was that the "Prisoners do not have [a] valid legal agreement nor does documents meet criteria for allowable legal property. Warden Jackson was shown this as well due to [the sender] having another prisoner send mail in attempt to circumvent policy." *Id.*

**October 24, 2005—Rejection.** Campbell rejected twelve pages of legal documents from a prisoner by the name of Zavodsky, sent by Zavodsky's father. Doc. 1 (Complaint at Exhibit D-3). These documents included a "FOIA request response, retainer agreement, power of attorney, transaction document for investigation." *Id.* Under the reason for the rejection, Campbell wrote, "No legal agreement nor is this allowable legal property." *Id.*

**November 4, 2005—Misconduct.** Minton filed a Major Misconduct Report against Siggers, alleging that Siggers violated the prison rules against forgery and smuggling. Doc. 1 (Complaint at Exhibit E). The report claims that on October 31, 2005, Siggers sent a letter, using an envelope belonging to another prisoner, to a person outside the prison (Siggers claims it was sent to Zavodsky's father, *id.* at ¶ 20), asking this person to send documents to Siggers in an envelope marked with an attorney's name and "Attorney at Law." *Id.* at Exhibit E. Minton alleged that this attempt to get documents into the prison constituted smuggling, and that "Siggers also attempted to deceive staff by sending the letter out under a different prisoner's name and number." *Id.* After a hearing on November 18, 2005, Siggers was found guilty of forgery because the envelope he used showed the name of another prisoner, and "by not placing his own name as the person sending I find that he had falsified the document." *Id.* at Exhibit E-3. The charge of smuggling was found not to be established because neither Siggers's letter nor Minton's report describe what documents were to be sent to Siggers. *Id.* Siggers claims that after Minton wrote the Major Misconduct Report, he placed Siggers in segregation ("the hole") for fourteen days. Doc. 1 (Complaint at ¶ 22).

After the hearing report was issued, Siggers was sentenced to spend seven days in "toplock." *Id.* at Exhibit E-3. Siggers also points out that, "[i]ronically, several days prior to being put in the hole," the district judge presiding over his then-pending retaliation suit ordered that Siggers be allowed to appear at the jury trial on November 15 and 16, 2005. *Id.* at ¶ 23; *id.* at Exhibit E-2. The jury returned its verdict in favor of Siggers on November 17, 2005. *Id.* at ¶ 25.

\* \* \*

**September 12, 2006—Rejection.** Campbell rejected the following: "Summons, Respondent's Appearance, Respondent's Motion to Affirm, Memorandum Brief & Motion for Sanctions[,] of Another Prisoner Sent in by 3rd Party." Doc. 1 (Complaint at Exhibit F-1). Campbell's stated reason was that "Prisoner does not have current, valid legal agreement with this prisoner nor does material meet the criteria of legal property allowed," citing P.D. 04.07.112.

**September 15, 2006—Rejection and Grievance.** Campbell rejected one self-addressed, stamped envelope sent by an individual named Milton Robertson El, on the ground that "Stamps/Stamped envelopes are not allowed—Envelopes must be metered in prison store." Doc. 1 (Complaint at Exhibit F-2). For support she cited P.D. 05.03.118, which provides that stamps are contraband, but "a prisoner may receive a single stamped self-addressed envelope from an attorney, a court or a legitimate religious organization." P.D. 05.03.118, ¶ D.3. On this same day, Siggers alleges that he spoke with Jackson "regarding Defendant Campbell's conduct," and he claims that Jackson said that he agrees with Campbell's position, but that Siggers should file a grievance if he wishes to obtain clarification of the matter. Doc. 1 (Complaint at ¶ 28). Siggers filed a Step I grievance, which is discussed below. *Id.* at Exhibit F-4.

**September 29, 2006—Rejection.** Campbell rejected 116 pages of "Defendan[t's] Motion sent 3rd Party requesting assistance," from a prisoner at another Michigan prison. Doc. 1 (Complaint at Exhibit F-3). Again citing P.D. 04.07.112, Campbell's stated reason was that "Prisoners do not have current valid legal agreement nor does this meet the criteria for allowable legal property." *Id.* This Notice was amended and reissued on October 5, 2006, because the earlier Notice stated that the sender was then in another prison when, in fact, the sender had been paroled. *Id.* at Exhibit F-4.

**March 9, 2007—Rejection.** Campbell rejected mail containing seven pages of a "request for quote to provide a web site for a business." Doc. 1 (Complaint at Exhibit L). Citing P.D. 05.03.118, Campbell stated that "mail for the purpose of operating a business enterprise from within the facility is not allowed." *Id.*

> **March 26, 2007—Misconduct.** Siggers claims that on March 21, 2007, this website information was sent to him again "bearing the return address of an attorney, who was deceased. Defendant Campbell relayed the information to Defendant Minton." Doc. 1 (Complaint at ¶ 37). Then, on March 26, 2007, Minton filed another Major Misconduct Report against Siggers and again placed him in the hole. *Id.* at ¶ 38. The copy of Minton's report attached to the complaint is illegible, *see id.* at Exhibit M, but the report of the misconduct hearing shows that the charge of smuggling against Siggers was established, *id.* at Exhibit N. Siggers was ordered to spend thirty days in "detention." *Id.*

Siggers makes one additional allegation regarding the March 26, 2007 Major Misconduct Report. He claims that after he "was locked in the processing cage, Defendant Minton approached Plaintiff and said, 'Lawsuits and Grievances have a way of coming back to bite you in the ass. You got out of my last ticket, but we're going to make sure you don't beat this one.'" Doc. 1 (Complaint at ¶ 39). Siggers then said, "we will see what a judge has to say about this," to which Minton allegedly responded, "Judges don't run shit in here, we do." *Id.*

Siggers also alleges that he was visited by Reverend Joe Adams, who told Siggers that he had attempted to visit Siggers once before, but had been denied access. Doc. 1 (Complaint at ¶ 42). Reverend Adams also told Siggers that he was being harassed by state officials and that Siggers's letter to him had been opened and resealed. *Id.* Siggers makes similar claims regarding an attorney, Jennifer Morris. Siggers claims that "Attorney Morris advised Plaintiff that Plaintiff's letter to her had been opened and resealed." *Id.* at ¶ 43.

Then, on May 7, 2007, Defendant Minton allegedly told Siggers: "You think you're a real smart ass don't you. Did you think I wouldn't find out about the letters you wrote? A[in't] a damn thing none of them can do to me. You keep writing people about me, you'll find yourself 500 miles away." *Id.* at ¶ 44. Siggers was transferred to the Muskegon Correctional Facility on May 11, 2007. *Id.* at ¶ 45. At the time of his transfer, he was employed as a clerk in the Mound prison library; he was also the President of the Mound prison NAACP and the Chairman of the Mound Branch National Lifer Association Legal Committee. *Id.* at ¶ 46.

## C. Siggers's Grievance Filings

As mentioned above, Siggers filed a Step I grievance after the September 15, 2006, mail rejection. Doc. 1 (Complaint at Exhibit F-5). In this grievance, he complains of numerous mail rejections; he mentions (1) the September 6, 2005 Notice, (2) "several additional notices" that he received after he spoke with Warden Jackson at the Warden's Forum on October 6, 2005[4], (3) the October 24, 2005 Notice, and (4) in the time after he was ordered to be taken to his civil trial, "a half dozen additional notices from Ms. Campbell, rejecting legal documents sent to me; the latest of which is dated 9-12-06." *Id.* With respect to the first three of these and the first misconduct report, Siggers asserted that "[t]hese actions were in retaliation for challenging the rejection of my legal documents and exercising my right of Access to Court." *Id.* At the end of the grievance, Siggers claims that "[t]he previous and continuing aforementioned actions were and are in violation of my First and Fourteenth Amendment rights to Freedom of Speech, Access to Courts, Due Process and Freedom from Staff abuse of Authority." *Id.* This grievance was denied on October 16, 2006. *Id.* at Exhibit F-6.

Siggers then filed a Step II grievance, claiming that the response to his first grievance "is a misrepresentation of the facts, misinterpretation of policy and erroneously compounds the retaliatory actions of Mailroom Clerk Campbell and further interferes with my right of Access To Court." *Id.* at Exhibit G. The Grievance Coordinator acknowledged receipt of this Step II grievance and informed Siggers that if he did not receive a response by November 17, 2006, then Siggers "may submit [a] Step III appeal." *Id.* at Exhibit J. Because he did not receive a response by November 17, Siggers claims that he filed his Step III appeal on November 24, 2006. *Id.* at ¶ 35; *id.* at Exhibit K-1. The Step III grievance was denied on July 16, 2007. Doc. 22-3 at 2 (Step III Grievance Response). It should also be noted that Siggers's Step II claim was denied on December 18, 2006; among other things, the denial stated that insofar as the grievance mentions Notices issued prior to September 12, 2006, the grievance could

---

[4]Given the context of this Grievance and the timeline of events, this is presumably a reference to the October 10 and 11, 2005 Notices.

have been rejected at Step I as untimely.  *Id.* at 4–6 (Step II Grievance Response) (citing P.D. 03.02.130).**5**

Siggers filed a second grievance on April 8, 2007, "on Ellen Campbell, NRF mail room Clerk and Lt. Minton, 6–2 shift, for conspiracy to deprive me of my civil rights by submitting false smuggling misconduct report and failing to follow proper policy and procedure."  Doc. 23 at Exhibit S-1.  This grievance was denied "without processing" because

> the issue(s) contained in the grievance are nongrievable per policy.  Per PD-03.02.130—Prisoner/Parolee Grievances, decisions made by a Hearing Officer on Minor and Major misconducts . . . and issues that are directly related to the hearing process are nongrievable.  Your avenue of recourse is through the Request for Rehearing process within PD-03.03.105—Prisoner Discipline, and not through the prisoner grievance process.

*Id.* at Exhibit S-2.

## D.  District Court Proceedings

After this lawsuit was filed, the defendants filed a motion to dismiss for failure to exhaust administrative remedies and for failure to state a claim.  The Magistrate Judge issued a Report and Recommendation on August 26, 2008, which was adopted in part and rejected in part by the district court on December 10, 2008.  The district court held that Siggers's September 16, 2006 grievance was sufficient to exhaust only the claims against Campbell and Jackson "relating to the September 12, 2006, notice of mail rejection, but that [the claims against] Jackson [should be dismissed because he] did not have the required level of personal involvement."  Doc. 46 (Opinion and Order at 4).  The district court also held that Siggers did not exhaust his claims against Campbell and Minton relating to the March 26, 2007, misconduct report.  *Id.*  Along with the

---

**5**Policy Directive 03.02.130 requires an individual to attempt to resolve a potentially grievable issue with staff within two business days after becoming aware of the issue, "unless prevented by circumstances beyond his/her control," P.D. 03.02.130, ¶ R (effective 12/19/03), and if that doesn't work, to file a grievance within five business days after attempting to resolve the issue with the staff member, *id.* at ¶ X.  (A newer version of this directive went into effect on July 9, 2007.)

Magistrate Judge's dismissal of the claims against Caruso, this meant that only Siggers's "claims against Campbell relating to the September 12, 2006, mail rejection" were left. *Id.* at 12.

Campbell and Siggers then filed cross-motions for summary judgment. Siggers also moved to delay consideration of these summary judgment motions so that he could obtain discovery from the defendants. The Magistrate Judge issued a Report and Recommendation that summary judgment be granted in favor of Campbell. The district court adopted this R&R on September 25, 2009. Siggers filed a notice of appeal on October 28, 2009, which this court treated as timely. In this appeal, the Michigan attorney general's office has elected not to file a brief, but rather to rely upon the district court's decisions and the state's prior briefs. March 16, 2010, letter from Douglas G. Powe to Roy G. Ford in No. 09-2404.

## II. ANALYSIS

Siggers essentially makes five arguments in this appeal. In his view, the district court erred: (1) by holding that the claims against Minton, Jackson, and Campbell regarding the mail rejections, the two major misconduct tickets, and the April 8, 2007 grievance were not exhausted, (2) by holding that the conspiracy claim against Campbell and Minton was not exhausted, (3) by holding that Jackson did not have the necessary level of personal involvement, (4) by granting summary judgment to Campbell on September 25, 2009, and (5) by refusing to allow Siggers his requested discovery materials before ruling in favor of Campbell on summary judgment.

"We review de novo a district court's grant of summary judgment." *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006). Summary judgment is appropriate where there is "no genuine issue as to any material fact." FED. R. CIV. P. 56(c) (effective December 1, 2007).[6] This court "must construe the evidence and draw all reasonable

---

[6] Rule 56 was amended in 2010. The basic standard for summary judgment was moved to subsection (a), and the language quoted above was changed to "no genuine *dispute* as to any material fact." FED. R. CIV. P. 56(a) (effective December 1, 2010) (emphasis added). The Advisory Committee notes to this amendment state that "'Dispute' better reflects the focus of a summary-judgment determination." For the remainder of this opinion, however, we will refer to the version of the rule that was in effect at the time

inferences in favor of the nonmoving party." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

## A. Exhaustion Of The Claims Against Minton, Jackson, And Campbell Regarding The Mail Rejections, The Two Major Misconduct Tickets, And The April 8, 2007 Grievance

### 1. The Mail Rejections

Siggers argues that the district court erred in holding that he "was required to file individual grievances challenging each of the mail rejections issued by Defendant Campbell." Siggers Br. at 10. In our view, the district court's decision that these claims were unexhausted can be broken into two parts: the Notices that occurred *before* September 12, 2006 (i.e., the Notices from September 6, 2005; October 10, 2005; October 11, 2005; and October 24, 2005), and the Notices that occurred *after* September 12, 2006 (i.e., the Notices from September 15, 2006; September 29, 2006; and March 9, 2007).

With respect to the first group, the district court was correct to find them unexhausted. The PLRA's exhaustion requirement, contained in 42 U.S.C. § 1997e(a), requires "proper" exhaustion, which includes compliance with a state agency's timeliness deadlines. *See Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."); *see also id.* at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). P.D. 03.02.130 requires an individual to attempt to resolve a potentially grievable issue with staff within two business days after becoming aware of the issue, "unless prevented by circumstances beyond his/her control," P.D. 03.02.130, ¶ R, and if that doesn't work, to file a grievance within five business days after attempting to resolve the issue with the

---

of the motion and the district court's opinion. *See Wheeler v. Newell*, 407 F. App'x 889, 891 n.3 (6th Cir. 2011) (unpublished opinion) (applying the pre-2010-amendment version of Rule 56 that was "in effect at the time the motion [for summary judgment] was filed"); *Tenneco Automotive Operating Co. v. Kingdom Auto Parts*, 410 F. App'x 841, 848 n.2 (6th Cir. 2010) (unpublished opinion) (applying the pre-2010-amendment version of Rule 56 that was "in effect at the time of the orders below").

staff member, *id.* at ¶ X. It is undisputed that Siggers did not file a grievance for any of these Notices within this time frame.[7] Consequently, Siggers's claims with respect to the Notices from September 6, 2005; October 10, 2005; October 11, 2005; and October 24, 2005, are unexhausted. We affirm the district court's dismissal of these claims.

We also affirm the district court's decision on the second group of Notices, those from September 15, 2006; September 29, 2006; and March 9, 2007. Siggers argues that his September 16, 2006, grievance put the defendants on notice of a continuing violation. Siggers Br. at 10–13 (citing *Ellis v. Vadlamudi*, 568 F. Supp. 2d 778 (E.D. Mich. 2008), and *Johnson v. Johnson*, 385 F.3d 503, 520–21 (5th Cir. 2004)).

*Ellis* and *Johnson* are distinguishable, and therefore unpersuasive. In *Ellis*, a case from the Eastern District of Michigan, a Michigan prisoner argued "that prison medical personnel were deliberately indifferent to his medical conditions that caused chronic pain." *Ellis*, 568 F. Supp. 2d at 783. The prisoner filed a grievance complaining of deliberate indifference in failing to treat his chronic condition, and after noting Michigan's two- and five-day deadlines for filing grievances, the district court held that "a grievance that identifies the persistent failure to address that condition must be considered timely as long as the prison officials retain the power to do something about it." *Id.* at 783–84. Furthermore, because the condition was ongoing, the grievance was timely for all claims that could be filed regarding the condition, not just those that occurred within the seven days prior to the filing of the grievance; so, for example, the claim that several nurses—whom the prisoner saw long before the seven-day window—conspired against the prisoner was timely because it stemmed from the ongoing condition. *Id.* at 784–85.

*Ellis* is therefore distinguishable because it deals with an ongoing medical condition and the claim that the state stood by and did nothing in the face of that ongoing condition. In such circumstances, determining when to apply the seven-day filing period can be difficult because there is not one discrete harm-causing act by the government.

---

[7]The state argued before the district court in its motion to dismiss that the 2005 Notices were unexhausted. Doc. 22 at 6–7, 13.

Here, however, Siggers was not suffering from one, continuing harm and government indifference. Rather, the Notices of mail rejection that Siggers identifies are each discrete events, and each Notice involves separate facts and circumstances—and even different policy directives. Furthermore, a grievance on each would have permitted an investigation into the reasons for each rejection, based on the different contents of each rejected piece of mail. Consequently, *Ellis* is not persuasive.

*Johnson* is also not persuasive. In *Johnson*, a Fifth Circuit case, a prisoner who was subjected to repeated sexual assaults complained that prison officials failed to protect him over the course of eighteen months. *Johnson*, 385 F.3d at 519. Texas had a rule that grievances must be filed within fifteen days of the alleged conduct to be timely, and the Fifth Circuit held the plaintiff's grievance to suffice with respect to all assaults that occurred *after* the grievance was filed, in addition to those within the fifteen-day pre-grievance window. *Id.* at 519–20. The Fifth Circuit found it unrealistic to expect Johnson to file a new grievance every fifteen days, or every time an assault occurred; indeed, the prison regulations threaten sanctions for "excessive use of the grievance process." *Id.* at 521. *Johnson* is therefore similar to the present case in that it involves repeated instances of discrete acts of harm. Nonetheless, the theory behind *Johnson* does not apply in this case. In *Johnson*, the prisoner complained of a single government failure (the failure to protect the inmate from harm) and harms that occurred to the prisoner on a repeated basis due to that failure (the sexual assaults). Johnson's grievance complaining of this one government failure properly sufficed to exhaust subsequent harms because the government was put on notice of its failure, and any subsequent grievance filed would have complained of the exact same government failing.

Here the September 12, 2006 Notice—the only part of Siggers's grievance that can be said to excuse his need to file subsequent grievances—was based on P.D. 04.07.112, regarding prisoner personal property, and two of the three subsequent Notices were *not* based on this policy directive. The September 15, 2006 Notice was based on P.D. 05.03.118, ¶ D.3., regarding improper receipt of a self-addressed stamped envelope;

the September 29, 2006 Notice was based on P.D. 04.07.112, and the March 9, 2007 Notice was based on P.D. 05.03.118, ¶ D.7., regarding mail used to operate a business from within the facility. The September 15, 2006 Notice therefore did not put the state on notice of an ongoing problem regarding P.D. 04.07.112. It also is not clear that Siggers would have faced sanctions for filing grievances regarding these additional Notices. Policy Directive 03.02.130 provides that "[a] prisoner . . . who files an excessive number of grievances which are frivolous, vague, duplicative, [or] raise non-grievable issues . . . may have access to the grievance process limited . . . . If the prisoner . . . continues to file such grievances while on modified access, the Warden or FOA Area Manager may extend the prisoner's . . . modified access status . . . ." P.D. 03.02.130, ¶ JJ (effective 12/19/2003). Filing three additional grievances, two of which would be based on *different* policy directives, would not have exposed Siggers to a threat of sanctions. We therefore affirm the district court's holding that Siggers failed to exhaust all of this mail-rejection claims except for that based on the September 12, 2006 Notice.

### 2. The Major Misconduct Tickets

Siggers argues that the district court erred in its finding that, although he did exhaust his claims arising out of the two major misconduct tickets by proceeding through a hearing, he did not complain that the major misconduct tickets constituted *retaliation* in the hearing. Specifically, Siggers points to the hearing on the November 4, 2005 misconduct, and the fact that the district court noted that the record reveals only that Siggers submitted "a statement" in this hearing, in which "Siggers attempted to explain why he had committed the acts resulting in the major misconduct ticket." Doc. 46 (Opinion and Order at 9).

Siggers now points to the actual statement he gave at the hearing, which was apparently unavailable at the time the district court issued its opinion. He quotes a portion of this statement in the motion to amend or reconsider the judgment that he filed after the district court's order in which he stated that his mail was "intercepted and not delivered, as an act of retaliation," and he argues that this shows that the district court

erred in stating that he did not claim that the November 4 misconduct report was an act of retaliation. Siggers Br. at 13 (quoting Doc. 48 (Motion to Alter or Amend the Judgment and/or for Reconsideration at 17)).

It appears, however, that Siggers's motion for reconsideration was denied by the district court for two reasons. First, reconsideration would be improper because the statement should have been provided before the district court's ruling. Doc. 54 (Order at 4). Second, the retaliation complained of in the statement is not said to be the issuance of a major misconduct ticket; it is said to consist of "intercept[ing] and not deliver[ing]" Siggers's mail. *Id.* Thus, this statement does not establish that Siggers claimed, in the hearing, that a misconduct report was an act of retaliation.

We affirm the district court's decision based upon both of these reasons.

### 3. The April 8, 2007 Grievance

With respect to his April 8, 2007, Step I grievance, Siggers argues that he should be excused from having to file a Step II and a Step III grievance because he "requested a Step 2 grievance form while in the hole, but never received a response from the grievance coordinator. . . . Had Plaintiff pursued the matter further, he risked being sanctioned and placed on Modified Grievance Access." Siggers Br. at 14.

There is no merit in this argument. This grievance relates to the issuance of major misconduct reports, and Michigan's rules provide that the only avenue for challenging such reports is a hearing: "Decisions made in hearings conducted by hearing officers of the Hearings and Appeals Division of the Office of Policy and Hearings (OPH)" are non-grievable and "shall be rejected by the Grievance Coordinator." P.D. 03.02.130, ¶ F.1. Thus, a Step II or a Step III grievance would have been rejected as non-grievable, as well. The April 8, 2007 grievance is irrelevant and was properly dismissed by the district court. We therefore reject Siggers's argument that the April 8, 2007 grievance was properly exhausted.

**B.  Exhaustion Of The Conspiracy Claim Against Campbell And Minton**

Siggers next argues that the district court erred in holding that he did not properly exhaust his conspiracy claim because he did not mention Minton in the grievance on that claim.  There is no merit in this argument.  In the September 16, 2006 grievance, Siggers does mention Minton, but he claims that Minton's actions were "in retaliation for challenging the rejection of my legal documents . . .," not that these actions were part of a conspiracy with Campbell.  Doc. 1 (Complaint at Exhibit F-5).  His April 7, 2007 grievance was non-grievable because it related to the issuance of major misconduct reports.  We therefore reject this argument.

**C.  The Level Of Jackson's Personal Involvement**

The district court dismissed all claims against Warden Jackson on the ground that Siggers has not alleged sufficient personal involvement by Jackson.  Specifically, the district court first correctly noted that a § 1983 claim may not be based on respondeat superior liability; instead, the "supervisory official at least [must have] implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  Doc. 46 (Opinion and Order at 10–11) (quoting *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (citation and quotation marks omitted)).  The district court also stated that a "mere failure to act" is not enough; "the supervisors must have actively engaged in unconstitutional behavior." *Id.* at 11 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (citation and quotation marks omitted)).  The district court then considered Jackson's alleged involvement, namely that he told Siggers on September 24, 2006 that he agreed with Campbell's decision, but that Siggers should file a grievance if he desired clarification. *Id.*  In the district court's view, whatever approval of Campbell's actions Jackson may have indicated was rendered insufficient to meet the requirements of § 1983 because of the fact that he recommended that Siggers file a grievance for clarification. *Id.*

Siggers claims now that Jackson's involvement is shown by the fact that, despite his awareness of Campbell's actions and Siggers's concerns, Jackson disregarded and

failed to remedy the allegedly unlawful actions and thereby "encouraged" them "by failing to act on information indicat[ing] that unconstitutional acts were occurring." Siggers Br. at 18 (citations and quotation marks omitted; alteration in original). This argument has no merit. As the district court stated, Jackson suggested to Siggers on September 24, 2006, that Siggers file a grievance. Consequently, Jackson actually encouraged Siggers to pursue the proper remedy. Furthermore, Jackson's alleged "approval" of Campbell's two Notices does not qualify as "active[] engage[ment] in unconstitutional behavior" because even though it may show that Jackson applied P.D. 04.07.112 incorrectly, it certainly does not show that he did so to retaliate against Siggers, which is the key to the constitutional violation asserted by Siggers. We therefore reject this argument.

**D. The Refusal To Permit Siggers To Have Access To Discovery Materials**

Siggers's next argument is that the district court erred in denying his motion to delay consideration of the cross-motions for summary judgment to provide him time to obtain more discovery. At the time of the motion and the district court's ruling, a litigant who wished to obtain additional facts to oppose a summary judgment motion could make a request to do so under Rule 56(f), which provided:

> (f) When Affidavits Are Unavailable. If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) deny the motion;
>
> (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
>
> (3) issue any other just order.

Fᴇᴅ. R. Cɪᴠ. P. 56(f) (effective December 1, 2007).[8] "Because Rule 56(f) makes the trial court's allowance of additional discovery discretionary, our standard of review is abuse of discretion." *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 426 (6th Cir. 2009). "The affidavit required by Rule 56(f) to support a request for additional discovery must indicate the need for discovery, what material facts may be uncovered, and why the information has not been previously discovered." *Id.* "A number of different factors are applicable to such claims [of an abuse of discretion], such as (1) when the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests." *Plott v. General Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995) (internal citations omitted); *see also CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008) (same). "Typically, when the parties have no opportunity for discovery, denying the Rule 56(f) motion and ruling on a summary judgment motion is likely to be an abuse of discretion." *CenTra*, 538 F.3d at 420 (collecting cases).

On September 24, 2007, Siggers served on the defendants a discovery request. *See* Doc. 16 (Defendants' Motion to Stay Discovery at Exhibits 1–12). The defendants filed a motion to stay discovery pending the outcome of their claim of qualified immunity, and a stay was granted on August 26, 2008. Then, five days after all but one of Siggers's claims were dismissed on December 10, 2008, the magistrate judge lifted the discovery stay and set a March 16, 2009 discovery deadline. Campbell filed her

---

[8] Rule 56 was amended in 2010; subsection (f) was moved to subsection (d), which now provides:
(d)     When Facts Are Unavailable to the Nonmovant.  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1)     defer considering the motion or deny it;
(2)     allow time to obtain affidavits or declarations or to take discovery; or
(3)     issue any other appropriate order.
Fᴇᴅ. R. Cɪᴠ. P. 56(d) (effective December 1, 2010).  The Advisory Committee Notes to this amendment state that "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f).  A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion."  As with the changes to Rule 56(c), we refer here to the version of the rule that was in effect at the time of the motion and the district court's opinion.  *See Wheeler*, 407 F. App'x at 891 n.3; *Tenneco Automotive*, 410 F. App'x at 848 n.2.

motion for summary judgment in February 2009, however, so when March 16, 2009 arrived, Siggers filed a Motion to Delay Consideration of Defendant's Motion for Summary Judgment until the Court Decides Plaintiff's Rule 59 and Discovery Motions. Doc. 56 (Motion to Delay Consideration).

In his motion, Siggers sought to have the discovery materials listed in his original discovery request provided to him before the district court ruled on the pending cross-motions for summary judgment. The Report and Recommendation of the magistrate judge recommended that the district court deny this motion. In particular, the magistrate judge believed that even if, contrary to the claims of the defendants, a hearing had occurred on the September 12, 2006 Notice, and a hearing report therefore existed, this report would be irrelevant because "[n]othing that happened at the hearing, if there was one, bears on whether the initial rejection of the mail was proper or based on a retaliatory motive." Doc. 66 (Report and Recommendation at 4). Siggers objected to this R&R by noting that "Defendant has not provided Plaintiff *any* of the requested discovery materials, despite this Court's prior order to do so." Doc. 69 (Siggers's Objections to the R&R at 2) (emphasis in original). He further claimed that these materials—"interrogatories, admissions and production of documents"—"will provide material facts which will further support his claims." *Id.* The district court was willing to assume that Siggers's unsworn pleading satisfies Rule 56(f)'s requirement of an affidavit, but the court ultimately denied the motion on the ground that "Siggers' objection fails to identify with any specificity either the particular discovery that he needs or how that discovery is essential to his opposition to Campbell's Motion for Summary Judgment." Doc. 71 (Opinion and Order at 5).

It was an abuse of discretion for the district court to deny this motion, given that Siggers has never received a response to his discovery request, and in light of the obvious relevance of this discovery and the potential for it to aid his opposition to summary judgment. Even if one agrees that a hearing report on the September 12, 2006 Notice does not exist (because Siggers never requested a hearing), the rest of his discovery request is quite specific in what it seeks. With respect to the discovery he

requested from Campbell, he seeks some documents that would be both easily produced and informative: (1) the hearing reports regarding the September 6, 2005 and September 29, 2006 Notices; and (2) "any e-mails, memo's or any other correspondence written by you, or to you concerning Plaintiff Siggers mail, or his status as a prisoner, while at the Mound Correctional Facility." Doc. 16 (Defendants' Motion to Stay Discovery at Exhibit 5). His interrogatories are also quite simple; he seeks to know (1) "the names and job responsibilities of all the staff members you have worked with in the Mound Facility mailroom from 2005–2007"; (2) "the names of everyone you contacted or who contacted you, in relation to the actions you took in issuing Plaintiff Siggers mail rejection notices"; (3) "whether you have ever been reprimanded, or disciplined during your employment by the Department of Corrections. If so, state the nature of the reprimand or discipline, and when it occurred;" and (4) "whether a civil action or lawsuit has ever been filed against you in relation to your MDOC employment. If so, state how many, when, what were the causes of action and outcome." *Id.* at Exhibit 4.

Siggers identified the discovery he sought with sufficient specificity. Siggers's discovery request was in the record as a set of attachments to the Defendants' first motion to stay discovery, and Siggers clearly argued to the district court that "Defendant has not provided Plaintiff *any* of the requested discovery materials, despite this Court's prior order to do so," Doc. 69 (Siggers's Objections to the August 26, 2009 R&R at 2). Additionally, these materials have obvious potential to provide information on which Siggers could rely in opposing summary judgment. Siggers has sought discovery from Campbell (and others) since 2007, and he has not been dilatory. The hearing reports requested may bring to light evidence regarding the motivations behind Campbell's actions and whether she genuinely believed the mail violated P.D. 04.07.112. The discovery period was shortened because of the long discovery stay imposed by the district court, which was sought by the defendants on the ground that qualified immunity would obviate the need for discovery. Finally, as mentioned, the defendants do not appear to have otherwise been responsive to any of Siggers's discovery requests.

We therefore hold that it was an abuse of discretion for the district court to deny Siggers's motion to delay consideration of the cross-motions for summary judgment, and we reverse this portion of the district court's decision. We remand for further proceedings consistent with this opinion.

**E.  The Grant Of Summary Judgment To Campbell**

Siggers also challenges the district court's grant of summary judgment in favor of Campbell on Siggers's claim that the September 12, 2006 Notice that Campbell issued Siggers was in retaliation for Siggers's success in his prior lawsuit. Because we hold that it was an abuse of discretion for the district court to deny Siggers's Rule 56(f) motion, we also hold that it was premature for the district court to rule on the merits of Campbell's motion for summary judgment. We therefore reverse the district court's September 25, 2009, grant of summary judgment in favor of Campbell, and remand for further proceedings consistent with this opinion.

## III.  CONCLUSION

For the reasons stated above, we **REVERSE** the district court's September 25, 2009, denial of Siggers's motion to delay consideration of summary judgment and its grant of summary judgment to Campbell in that same opinion. We **AFFIRM** the district court's December 10, 2008, dismissal of all of Siggers's other claims. We **REMAND** the case to the district court for further proceedings consistent with this opinion.