2012 COA 113

**Jimmie Louise GRAY, individually and as Personal Representative of the Estate of Charles Gray; Teresa Leeper; David Gray; and Tim Gray, Plaintiffs–Appellants,**

v.

**UNIVERSITY OF COLORADO HOSPITAL AUTHORITY, a body corporate and political subdivision of the State of Colorado; University of Colorado Hospital; Mark Spitz, M.D.; Archana Shrestha, M.D.; Christy Barbee–Young, M.D.; Mollie Startzer, R.N.; Beverly Solas–Fajardo, C.N.A.; Jason Booe; Jacqueline Funk; and John Doe and Jane Doe, Defendants–Appellees.**

No. 11CA1041.

Colorado Court of Appeals, Div. VI.

July 5, 2012.

Leventhal, Brown & Puga, P.C., Natalie Brown, Benjamin Sachs, DezaRae D. La-Crue, David P. Mason, Denver, Colorado, for Plaintiffs–Appellants.

Hall & Evans, LLC, Richard L. Murray, Jr., Denver, Colorado, for Defendants–Appellees University of Colorado Hospital Authority; University of Colorado; Mollie Startzer, R.N.; Beverly Solas–Fajardo, C.N.A.; Jason Booe; and Jacqueline Funk.

Patrick T. O'Rourke, Denver, Colorado for Defendant–Appellees Mark Spitz, M.D.; Archana Shrestha, M.D.; Christy Barbee–Young, M.D.

Opinion by Judge BERNARD.

¶ 1 This appeal poses two questions that arise from a trial court's decision to dismiss a lawsuit that named a public entity, the University of Colorado Hospital and the University of Colorado Hospital Authority (collectively the hospital), and some of its employees as defendants. First, is a public entity immune from liability for tort claims based on allegations that the entity or the entity's employees acted in a willful and wanton manner? In this case, we conclude the hospital is immune, and, therefore, we affirm the trial court's decision to dismiss the case against it.

¶ 2 Second, is a public employee likewise immune if a plaintiff alleges that he or she acted in a willful and wanton manner? In this case, we conclude that the trial court erred when it dismissed the case against one of the public employees, Mark Spitz, M.D. (the doctor), and we remand the case for further proceedings concerning that employee. However, we conclude that the trial court properly dismissed the case against the rest of the public employees, and, as a result, we affirm those decisions.

¶ 3 This case arose out of the death of Charles Gray, who died while he was a patient at the hospital. His family, including Jimmie Louise Gray, acting individually and as the patient's personal representative, Teresa Leeper, David Gray, and Tim Gray, brought a medical malpractice suit against the hospital and some of its employees.

¶ 4 The defendants in this lawsuit are the hospital; the doctor; Archana Shrestha, M.D.; Christy Barbee–Young, M.D.; Mollie Startzer, R.N.; Beverly Solas–Fajardo, C.N.A.; Jason Booe; Jacqueline Funk; and John Doe and Jane Doe. The defendants moved to dismiss the case against all defendants under the Colorado Governmental Immunity Act (CGIA). The trial court granted the motion.

¶ 5 The family appeals this decision. We affirm in part, reverse in part, and remand for further proceedings. In our analysis affirming a part of the trial court's order, we rely on somewhat different grounds than the trial court employed. *See W.O. Brisben Companies, Inc. v. Krystkowiak,* 66 P.3d 133, 138 (Colo.App.2002)(an appellate court will affirm a trial court's decision if that decision reached the correct result), *aff'd on other grounds,* 90 P.3d 859 (Colo.2004).

## I. Background

¶ 6 The complaint contained the following factual allegations. All defendants accepted these facts as true for the purposes of their motion to dismiss.

¶ 7 The patient suffered from epilepsy. In an effort to determine whether a form of surgery would afford him relief from his condition, he checked into the epilepsy monitoring unit at the hospital in October 2007. The purpose of this admission was to monitor the nature and extent of his seizures as he was weaned from the anti-seizure medication that had been prescribed for him.

¶ 8 Part of the monitoring process required the patient to stay several nights in the hospital. Concerned for his welfare, members of his family asked whether they should stay with the patient to assist in monitoring his seizures. Someone associated with the hospital assured the patient and his family that he would be constantly monitored by hospital personnel around the clock.

¶ 9 The hospital, through a representative, later admitted that this assurance was contrary to fact. He also conceded that hospital policy allowed patients being monitored to gauge the effects of their seizures to be

unattended and unobserved by monitoring personnel for extended periods of time.

¶ 10 On the fifth night of the patient's stay, the monitoring technician left him unattended for about one hour in order to "troubleshoot" another patient's electrodes. During this time, the patient suffered a seizure and stopped breathing. Hospital staff was unable to revive him.

¶ 11 The patient's family sued defendants in federal district court. However, the federal court dismissed their suit, concluding that they had "failed to allege a cognizable [c]onstitutional violation sufficient to support a § 1983 claim." The court declined to exercise supplemental jurisdiction over the remaining state-law claims, and dismissed them without prejudice.

¶ 12 The patient's family then sued defendants in state court. The first amended complaint, which forms the basis of this appeal, alleged a series of claims against defendants: negligence; respondeat superior; negligent training and supervision; lack of informed consent; negligent misrepresentation; fraudulent misrepresentation; breach of fiduciary duty; reckless and/or intentional infliction of emotional distress; and willful and wanton conduct.

¶ 13 Defendants moved to dismiss the case, alleging that the defendants were immune under the CGIA. The hospital also requested permission to tender $150,000 into the court registry as the maximum recovery possible under the CGIA. Neither party requested a *Trinity* hearing, named for our supreme court's decision in *Trinity Broadcasting of Denver, Inc. v. City of Westminster,* 848 P.2d 916 (Colo.1993).

¶ 14 The trial court granted the motion to dismiss, and it permitted the hospital to deposit $150,000 in the court's registry. The court then declared the claim moot.

## II. Analysis

### A. General Principles

¶ 15 The sovereign immunity of public entities is immunity from suit. *City of Lakewood v. Brace,* 919 P.2d 231, 245 (Colo. 1996). Whether a public entity and public employees are immune from suit is an issue of subject matter jurisdiction that is resolved under C.R.C.P. 12(b)(1). *Trinity,* 848 P.2d at 924–25. The plaintiff bears the burden of showing that immunity has been waived. *Capra v. Tucker,* 857 P.2d 1346, 1348 (Colo. App.1993).

¶ 16 The issue whether the trial court has subject matter jurisdiction under the CGIA is a matter of statutory interpretation, to be decided under C.R.C.P. 12(b)(1). *Herrera v. City & Cnty. of Denver,* 221 P.3d 423, 425 (Colo.App.2009). We review the trial court's interpretation of the CGIA de novo. *Moran v. Standard Ins. Co.,* 187 P.3d 1162, 1164–65 (Colo.App.2008).

¶ 17 Our goal in interpreting the CGIA is to give effect to the General Assembly's intent. *Middleton v. Hartman,* 45 P.3d 721, 730 (Colo.2002). To do so, we look first to the statute's plain language. *Herrera,* 221 P.3d at 425. The CGIA's terms should be construed in harmony with one another to give full effect to the General Assembly's intent. *Fogg v. Macaluso,* 892 P.2d 271, 274 (Colo.1995).

¶ 18 The CGIA provides immunity to all public entities from suit for all actions that lie in tort, or that could lie in tort, unless an enumerated exception applies. §§ 24–10–105, –106, –110, C.R.S.2011; *Bresciani v. Haragan,* 968 P.2d 153, 155 (Colo.App. 1998)(the CGIA provides public entities immunity from suit). One of those exceptions applies here: the statute explicitly waives a public entity's immunity for injuries resulting from the "operation of any public hospital." § 24–10–106(1)(b), C.R.S.2011.

¶ 19 When a public entity's immunity from suit is waived, a plaintiff's recovery is limited to $150,000 per occurrence from one or more public entities. § 24–10–114(1)(a), C.R.S.2011; *Lee v. Colorado Dep't of Health,* 718 P.2d 221, 229 (Colo.1986)(the cap on liability "provide[s] fiscal certainty to governmental operations and thereby secure[s] the continuing availability of these services to the public."). Further, subject to an exception that is not relevant here, public entities are not "liable either directly or by indemnification for punitive or exemplary damages or for damages

for outrageous conduct." § 24–10–114(4)(a), C.R.S.2011.

¶ 20 An issue becomes moot when the relief granted by the court would not have a practical effect upon an existing controversy. *Rudnick v. Ferguson,* 179 P.3d 26, 29 (Colo.App.2007). Therefore, when the plaintiff is offered the maximum amount recoverable at trial, a court usually refrains from addressing the issue of immunity because it is moot. *Id.* Under the CGIA, a case becomes moot when the plaintiff receives $150,000 per occurrence, as the maximum amount recoverable at trial. § 24–10–118(1), C.R.S.2011; *DeForrest v. City of Cherry Hills Vill.,* 72 P.3d 384, 387 (Colo.App.2002).

### B. The Hospital's Immunity Claim as a Public Entity

¶ 21 The patient's family contends that the trial court erred when it concluded that the hospital, as a public entity, was immune from suit for its own willful and wanton conduct or for the willful and wanton conduct of its employees. We disagree because our analysis of the pertinent statutes leads us to conclude that waivers of immunity for acts or omissions that are willful and wanton only apply to public employees, not to public entities.

¶ 22 First, section 24–10–106(1), C.R.S. 2011, states that "[a] public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort … except as provided otherwise in this section." The section then lists eight exceptions. § 24–10–106(1)(a)–(h), C.R.S.2011. The concept of willful and wanton conduct does not appear in any of those sections. Nothing in these statutes states that a public entity's sovereign immunity from suit is waived if either an entity or one or more of its employees engages in willful and wanton conduct. *Ramos v. City of Pueblo,* 28 P.3d 979, 980 (Colo.App.2001).

¶ 23 Second, the effect of the absence of any reference to willful and wanton conduct in section 24–10–106(1)(a)–(h) is further explained by the plain language of section 24–10–105(1), C.R.S.2011. That section makes clear that a public entity's immunity from suit is only waived as provided in article 10 of title 24. Thus, reading sections 24–10–105(1) and 24–10–106(1) together, a waiver of the sovereign immunity of public entities from suit is not triggered by an allegation of willful and wanton conduct because article 10 of title 24 does not expressly contain any language creating such a waiver.

¶ 24 Third, section 24–10–105(1) also contains an express exception that triggers a waiver of the sovereign immunity of *public employees* working within the scope of their employment if their acts or omissions were willful and wanton. § 24–10–105(1). This clear statement about public employees in the same statute that makes no such clear statement about public entities indicates that the legislature did not intend that a public entity's sovereign immunity would be waived if either the entity or its employee engaged in willful and wanton conduct. *See Regents of University of Colorado v. Students for Concealed Carry on Campus, LLC,* 271 P.3d 496, 500 (Colo.2012) (applying the interpretive canon *expressio unius exclusio alterius*—"the inclusion of certain items implies the exclusion of others"); *see also Ramos,* 28 P.3d at 980.

¶ 25 Fourth, section 24–10–110(1)(a)–(b), C.R.S.2011, sets forth the responsibilities of public entities to their employees who are sued for acts or omission arising out of the performance of their duties within the scope of their employment. These generally include assuming the costs of defending their public employees; paying any judgments entered against them; or satisfying any settlements involving them.

¶ 26 There are exceptions that relieve public entities of these responsibilities. One such exception is when the *employee's* acts or omissions were willful and wanton. There is no reference to the acts or omissions of the public entity in these subsections.

¶ 27 Thus, we conclude that the CGIA does not provide for the waiver of the sovereign immunity of public entities from suit based either on their own willful and wanton acts or omissions, or their employees' willful and wanton acts or omissions. Our supreme court reached the same conclusion

in *Middleton v. Hartman,* 45 P.3d 721, 728 (Colo.2002):

> According to the express language of section 24–10–110(1)(b)(I), the state is not liable for its employees' willful and wanton conduct. Thus, the state would not be liable for any willful and wanton acts committed by [its employees].

*See also King v. United States,* 53 F.Supp.2d 1056, 1072 (D.Colo.1999) (holding that the CGIA "operates as a waiver of a public employee's immunity but does not operate as a waiver of a public entity's immunity"), *rev'd in part,* 301 F.3d 1270 (10th Cir.2002); *Ramos,* 28 P.3d at 980 (Colorado's statutory scheme does not waive sovereign immunity for public entities if their employees have engaged in willful and wanton acts or omissions).

¶ 28 The patient's family argues that language in *Carothers v. Archuleta Cnty. Sheriff,* 159 P.3d 647, 654 (Colo.App.2006), supports a contrary view. There, although the division stated that "a public entity cannot be deemed to have waived sovereign immunity by virtue of its own willful and wanton conduct," it also stated, citing *Ramos,* that "a public entity is not liable for the willful and wanton conduct of its employees *unless the conduct falls within one of the waiver provisions of § 24–10–106.*" *Id.* (emphasis supplied).

¶ 29 Our analysis of *Carothers* leads us to conclude that it does not provide a compelling basis for reaching a different result. There, the division held that the public entity was entitled to sovereign immunity. The plaintiff alleged that the acts or omissions of the entity's employees were willful and wanton, but the conduct of the employees did not fall under any of the waivers of sovereign immunity found in section 24–10–106(1). Thus, the language on which the patient's family relies here is dicta.

¶ 30 Further, *Ramos,* the case the division cited in *Carothers,* does not support the interpretation of Colorado's statutory scheme that the patient's family urges on us. Our reading of *Ramos* indicates that its clear holding is the same one that we reach here: the sovereign immunity of public entities is not waived if their employees' acts or omissions are willful and wanton.

¶ 31 Thus, we conclude that the hospital is immune from suit for its own willful and wanton acts or omissions, or for the willful and wanton acts or omissions of its employees.

¶ 32 Our conclusion that it is immune from suit concerning allegations of willful and wanton conduct notwithstanding, the hospital recognizes that its sovereign immunity is nonetheless waived under section 24–10–106(1)(b). The trial court held, and we agree, that the hospital's liability is capped at $150,000, and the claim against it is rendered moot because it deposited that amount into the registry of the court to be distributed to the patient's family. As a result, we further conclude, in the course of our de novo review, that the trial court's decision to dismiss the case against the hospital as moot is fully supported by the pertinent law. *See* § 24–10–118(1); *DeForrest,* 72 P.3d at 387.

## C. Public Employees' Immunity Claims

¶ 33 The patient's family made numerous allegations in its complaint against various public employees. Some were named; others were included as defendants whose identities were not known. The patient's family contends that the trial court erred when it dismissed these claims for failing to meet the pleading requirement of the CGIA, and when it concluded that their actions were not willful and wanton. We agree with the family's argument concerning the doctor, but we disagree with their position concerning all the other individual defendants.

¶ 34 Unlike public entities, which have sovereign immunity from lawsuits, public employees have qualified immunity. This immunity is a defense that they may raise when named in their individual capacities. *Brace,* 919 P.2d at 245. Public employees are immune from liability for "injuries arising out of an act or omission occurring during the performance of his or her duties and within the scope of his or her employment, unless such act or omission was willful and wanton." § 24–10–105(1); *Brace,* 919 P.2d at 245 ("The CGIA expressly provides that an

employee loses that qualified immunity if the employee's act was 'willful and wanton.' ").

¶ 35 If a public employee acts willfully and wantonly, he or she "would be personally liable for any damage award." *Middleton*, 45 P.3d at 728. As indicated above, section 24–10–110(1)(a) requires that the public entity provide "defense costs for all its employees unless the fact finder determines he or she was acting outside the scope of duty [by acting willfully and wantonly] when the injury creating the liability occurred." *Middleton*, 45 P.3d at 728.

¶ 36 The $150,000 cap on recovery, discussed above in the section addressing public entities, does not apply to limit a public employee's liability if his or her acts or omissions were willful and wanton. § 24–10–118(1); *DeForrest*, 72 P.3d at 387 (if a public employee's actions were willful and wanton, the $150,000 cap on damages "is not applicable"). Although a public entity is *not* liable for exemplary damages, section 24–10–114(4)(a), C.R.S.2011, a public employee may be liable for exemplary damages if his or her acts or omissions were willful and wanton, section 24–10–118(1)(c), C.R.S.2011; *DeForrest*, 72 P.3d at 387. However, the public entity may agree to defend the employee against such a punitive damage claim, or agree to pay or settle such a claim, if it determines, at a public meeting and by resolution, that it is in the public interest to do so. § 24–10–118(5), C.R.S.2011.

¶ 37 Section 24–10–110(5)(a), C.R.S. 2011, requires that, when a plaintiff alleges that a public employee's acts or omissions were willful and wanton, "the specific factual basis of such allegations shall be stated in the complaint." Conclusory allegations are insufficient. *Wilson v. Meyer*, 126 P.3d 276, 282–83 (Colo.App.2005). If the complaint does not satisfy this standard, it must be dismissed for failure to state a claim under C.R.C.P. 12(b)(5). *Peterson v. Arapahoe Cnty. Sheriff*, 72 P.3d 440, 444 (Colo.App. 2003).

¶ 38 Whether a plaintiff has pled sufficient facts to state a claim alleging that a public employee's acts or omissions were willful and wanton is a threshold determination to be made by the court. *Rohrbough v. Stone*, 189 F.Supp.2d 1088, 1097 (D.Colo. 2001); *Moody v. Ungerer*, 885 P.2d 200, 204–05 (Colo.1994). If there are sufficient facts in the complaint, the issue whether the employee's acts or omissions were willful and wanton must be determined at trial. *Brace*, 919 P.2d at 245–46. This is because

> the legislature did not intend an individual [public employee's] immunity from tort suits, although derived from sovereign immunity, to have the same initially preclusive effect from suit [as the immunity of public entities]. This is reflected in the "willful and wanton" standard which mandates a fact-based determination. Such a determination is not susceptible to resolution at an early stage in the litigation process before significant discovery has been undertaken *unless there are no disputed issues of fact.* Moreover, a "willful and wanton" determination potentially requires the weighing of testimony and evidence, functions which are usually the province of the jury/trier of fact and not the trial court.

*Id.* at 246 (emphasis supplied).

¶ 39 Our supreme court has not adopted a controlling definition of the phrase "willful and wanton" for purposes of the CGIA. *See Moody*, 885 P.2d at 205. It has, however, referred to three definitions. As pertinent here, those definitions each indicate that, to be willful and wanton, public employees must be consciously aware that their acts or omissions create danger or risk to the safety of others, and they then act, or fail to act, without regard to the danger or risk. *Id.; see also Jarvis v. Deyoe*, 892 P.2d 398, 401 (Colo.App.1994) (the definitions to which the supreme court referred in *Moody* "all . . . involved an element of conscious disregard for the safety of others").

¶ 40 Thus, a complaint must "do more than merely assert" that a public employee's acts or omissions were willful or wanton; it must, at a minimum, also "set forth specific facts to support a reasonable inference" that the employee was consciously aware that his or her acts or omissions created danger or risk to the safety of others, and

that he or she acted, or failed to act, without regard to the danger or risk. *See Wilson,* 126 P.3d at 282; *see Davis v. Paolino,* 21 P.3d 870, 873–74 (Colo.App.2001) (allegation that officer intentionally left spilled coffee and juice on the floor in order to cause injury was sufficient to plead a claim for willful and wanton conduct).

### 1. The Doctor

¶ 41 Here, the doctor does not, for the purposes of his motion to dismiss, contest any of the complaint's allegations. Therefore, our task is to determine whether the complaint adequately alleged that the doctor's acts or omissions were willful and wanton. In other words, we must determine, applying *Brace, Moody,* and *Wilson,* whether the allegations in the complaint set forth specific facts to support a reasonable inference that the doctor was consciously aware that his acts or omissions created danger or risk to the patient's safety, and that the doctor acted, or failed to act, without regard to the danger or risk. We conclude that the allegations satisfy this standard.

¶ 42 The complaint contains the following allegations against the doctor:

- He told patients in the epilepsy monitoring unit that they would be monitored around the clock.

- He was aware that this representation was false.

- He "provided inadequate nursing and neurodiagnostic technologist staffing levels in the [epilepsy monitoring unit], thereby endangering epileptic patients such as [the patient] who experienced seizures and were in need of prompt medical attention."

- He intentionally adopted these staffing policies to "increase profits" for the hospital and the public employee defendants.

- The number of staff in the unit was "lower ... than reasonable for the type of operations, services, and care" the unit was to provide.

- The doctor "believed that additional staffing in the [unit] was necessary to ensure patient safety."

- He had informed hospital officials "responsible for budgeting hospital resources about 'near miss(es)' prior to" the time when the patient was admitted to the unit. (The complaint describes one "near miss" to have occurred when the "health, safety, well-being, and/or life" of a person who was being monitored in the unit "was put in danger because of unknown events that occurred during a period of time ... when this individual was not being monitored.")

- His staffing policies "caused a deterioration of the care received by epileptic patients such as [the patient]," and "placed the very lives of epileptic patients such as [the patient] at serious and direct risk."

- After the patient died, he told a family member that the hospital held discussions "concerning the errors made" in the patient's case and "necessary changes in hospital policies, procedures, protocols, or guidelines."

- He told the same family member that the patient had been "left unattended and unobserved for more than 30 minutes" and that the technician monitoring the patient "was attending to another patient" during this time.

¶ 43 We conclude that these allegations allege a sufficient factual basis to establish that the doctor was consciously aware that his acts or omissions created danger or risk to the patient's safety.

¶ 44 We reach this conclusion because the complaint alleges that the doctor:

1. Provided insufficient staff for the epilepsy monitoring unit.

2. Was aware that the unit had insufficient staff.

3. Was aware that the insufficient staff created a danger or risk to the patient's safety.

4. Intentionally misrepresented to the patient's family that such a danger or risk did not exist.

5. Placed the patient in the unit without regard to the risk or danger to the patient's safety.

6. Participated in creating the danger or risk in order to increase profits for the hospital and the public employee defendants.

¶ 45 Therefore, we conclude that the trial court erred when it concluded that the factual allegations were not sufficiently specific to support a reasonable inference that the doctor was consciously aware that his acts or omissions created danger or risk to the patient's safety, and that he acted, or failed to act, without regard to the danger or risk.

■ ¶ 46 In reaching this result, we likewise respectfully disagree with the trial court's conclusion that such allegations were insufficient because they were made upon "information and belief." " '[I]nformation and belief' pleadings are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant." *Johnson v. Johnson*, 385 F.3d 503, 531 n. 19 (5th Cir.2004); *see also* 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, *Federal Practice and Procedure* § 1224 (3d ed.) (collecting cases). The parties have not provided us with any Colorado authority stating that we follow a different path than federal courts interpreting federal rules of pleading in this regard, and we have not found any such authority independently. Thus, because the general rules of pleading in our C.R.C.P. 8 are similar, although not identical, to those contained in Fed.R.Civ.P. 8, we conclude that the reasoning in cases such as *Johnson* is persuasive. Therefore, we will apply it here. *See Dave Peterson Electric, Inc. v. Beach Mountain Builders, Inc.*, 167 P.3d 175, 177 (Colo.App.2007) (looking to Fed.R.Civ.P. 8(c) for guidance in interpretation of C.R.C.P. 8(c) because the federal rule was similar).

¶ 47 Here, the complaint's references to "information and belief" concerned information that was more accessible to the defendants. For example, the doctor or the hospital would have better access to information about (1) the events surrounding the "near miss" and what the doctor told the hospital about the "near miss"; (2) the doctor's belief that additional staffing was necessary in the unit to ensure patient safety; (3) whether the doctor provided inadequate staffing in the unit "thereby endangering" the patient and others; and (4) whether the doctor adopted the existing staffing policies to increase profits for the hospital, for himself, or for other defendants.

¶ 48 Further, our conclusion is supported by the nature of the immunity afforded the doctor under the CGIA. As *Brace* recognized, because his acts or omissions are alleged to have been willful and wanton, the doctor does not enjoy immunity from suit as long as there are disputed issues of fact. *Brace*, 919 P.2d at 245–46. Here, the complaint's allegations are sufficient to raise such a dispute.

¶ 49 Thus, the issue whether the doctor's acts or omissions were willful and wanton "is not susceptible to resolution at an early stage in the litigation process before significant discovery has been undertaken." *Id.* at 246. In reaching this conclusion, we offer no opinion on whether the doctor's acts or omissions were willful and wanton. Rather, we conclude, based on the record in this case, that the trial court erred when it determined that the doctor was immune from liability at this early stage of the proceedings. Therefore, we reverse the portion of the trial court's order dismissing the case against the doctor, and we remand that portion of the case to the trial court for additional proceedings.

### 2. The Technician

■ ¶ 50 We apply the same analytical principles to the allegations in the complaint concerning the technician who was monitoring the patient on the night he died. The complaint makes the following allegations against the technician:

- He "left [the patient] unattended and unobserved shortly before midnight, October 18, 2007, for a period of more than one hour in order to troubleshoot another ICU patient's electrodes."

- Upon returning, he found the patient to be "cold to the touch, non-responsive, pulse-less, and apneic." The technician "called a 'Code Blue' " and the responding medical personnel were unsuccessful in their attempts to resuscitate the patient.

- The hospital's protocol did not require the technician to monitor and observe patients continuously.

¶ 51 We conclude that these allegations, unlike those against the doctor, do not, under *Brace, Moody,* and *Wilson,* set forth specific facts to support a reasonable inference that the technician was consciously aware that his acts or omissions created danger or risk to the patient's safety. For example, there is no allegation that the technician (1) provided false information to the patient's family about the extent of monitoring the patient, or that he was aware that such false information had been provided to them; (2) was aware of inadequate staffing levels, or participated in creating inadequate staffing levels; (3) was aware of the "near miss"; (4) was responsible for staffing policies that placed the patient at risk; (5) was aware that he should monitor the patient at all times; or (6) was aware that, by leaving his monitoring of the patient to attend to another, he created a danger or risk that the patient would suffer injury or die. *See Moody,* 885 P.2d at 204–05 (allegation was not sufficient to plead a claim for willful and wanton conduct when a police officer's decision to follow a vehicle to its destination, rather than pull it over on the road, "was simply a choice between logical alternatives that a reasonable officer would entertain."); *Whitcomb v. City & Cnty. of Denver,* 731 P.2d 749, 752 (Colo.App.1986) (officer's decision not to transport a woman whose car had run out of gas was not willful and wanton because the officer's decision was not "malicious, or intended to cause harm").

¶ 52 Because the complaint did not satisfy the requirements of *Brace, Moody,* and *Wilson,* we conclude that the technician is immune from liability. We therefore agree with the trial court that the claim against the technician should be dismissed.

¶ 53 As a result of this holding, we need not decide whether the sudden emergency doctrine would apply in this context.

### 3. Other Defendants

¶ 54 The complaint contains additional allegations against "other defendants," some named and some unnamed, who are members of the hospital's staff. Although some allegations refer to specific acts or omissions, they do not indicate who was responsible for those acts or omissions. There is much less specificity in this regard concerning these defendants than in the allegations naming the doctor and the technician. Indeed, none of these defendants are specifically associated with any particular act or omission.

¶ 55 As a result, we hold that the complaint fails to describe the "specific factual basis" of the claims against these defendants. *See Rohrbough,* 189 F.Supp.2d at 1098 (complaint not sufficient when "the circumstances facing this unidentified Law Enforcement Defendant are also unknown. Without more, the general conclusory allegation that the conduct of 'the Law Enforcement Defendants' is 'willful and wanton' is insufficient to conclude that the conduct of the unidentified Law Enforcement Defendant was willful and wanton." (citation omitted)); *cf. Peterson,* 72 P.3d at 444 (complaint was sufficient, even when "presently unknown deputies" were responsible for the conduct, when the conduct of the deputies was specifically alleged and the unknown deputies were *connected* to a specific event).

¶ 56 Therefore, we conclude that these defendants are immune from liability, and that the trial court did not err when it dismissed the claims against them because the allegations concerning them lacked sufficient specificity.

¶ 57 The order is affirmed in part, reversed in part concerning only the doctor, and remanded for further proceedings concerning only the doctor.

Judge ROMÁN concurs.

Judge GABRIEL specially concurs.

Judge GABRIEL specially concurring.

¶ 58 I agree with the result reached by the majority and with virtually all of its analysis. I write separately, however, because my analysis of the question as to whether a public entity may be held liable for its own willful and wanton conduct differs from that of the majority.

¶ 59 As I understand it, Mr. Gray's family is asserting that defendants University of Colorado Hospital Authority and the University of Colorado Hospital can be held liable for their own willful and wanton conduct, which would allow the family to recover exemplary damages from these defendants. For two reasons, I disagree.

¶ 60 First, in my view, such an argument is expressly precluded by section 24–10–114(4)(a), C.R.S.2011, which provides, in pertinent part, "A public entity shall not be liable either directly or by indemnification for punitive or exemplary damages," subject to an exception not applicable here.

¶ 61 Second, I believe that the family's argument is inconsistent with section 24–10–114(1)(a), C.R.S.2011, which provides that when immunity is waived under the Colorado Governmental Immunity Act, the maximum amount that may recovered from one or more public entities and public employees for any injury to one person in any single occurrence is $150,000. This statutory limitation provides no exception for injuries resulting from an entity's willful and wanton conduct. Moreover, allowing recovery for exemplary damages beyond the statutory cap would be inconsistent with the General Assembly's goal of placing "an outer limit on the legal liability of a public entity in order to provide fiscal certainty to governmental operations and thereby secure the continuing availability of these services to the public." *Lee v. Colo. Dep't of Health,* 718 P.2d 221, 229 (Colo.1986).

¶ 62 In so analyzing this issue, I respectfully disagree with the majority's reliance on the fact that section 24–10–106(1)(a)–(h), C.R.S.2011, which lists eight exceptions to a public entity's sovereign immunity, does not refer to the concept of willful and wanton conduct. As pertinent here, section 24–10–106(1)(b) provides an exception for a public entity's sovereign immunity for, among other things, injuries resulting from the operation of a public hospital. It does not except from the exception injuries resulting from the operation of a public hospital where the actor's conduct was willful and wanton. Nor would I expect it do so, because an allegation of willful and wanton conduct does not give rise to a separate claim for relief. *See Harding*

*Glass Co. v. Jones,* 640 P.2d 1123, 1126 (Colo. 1982) (noting that section 13–21–102, C.R.S. 2011, which provides for the recovery of exemplary damages, does not create a separate legal right); *State Farm Fire & Cas. Co. v. Bellino,* 976 P.2d 342, 343 (Colo.App.1998) (noting that exemplary damages do not constitute a separate claim for relief). Moreover, each of the exceptions set forth in section 24–10–106(1)(a)–(h) describes a specific activity or condition. "Willful and wanton conduct," in contrast, refers to the level of egregiousness of an actor's conduct.

¶ 63 *Ramos v. City of Pueblo,* 28 P.3d 979, 980 (Colo.App.2001), on which the majority relies, is inapposite to the question of whether a public entity can be held liable for its own willful and wanton conduct. The division there was addressing a public entity's liability for the willful and wanton conduct of public employees. To the extent that the *Ramos* division's analysis can be construed as applicable to the question of whether an entity can be held liable for its own willful and wanton conduct, I respectfully disagree, for the reasons set forth above. *See Roque v. Allstate Ins. Co.,* 2012 COA 10, ¶ 20, —— P.3d ——, 2012 WL 150079 (noting that one division of this court is not bound by the decision of another division).

¶ 64 For these reasons, I concur specially in Part II(B) of the majority opinion and join the remainder of the opinion in full.